IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 8:09CR457 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MOTION TO DISMISS INDICTMENT** |
| | ) | **OR TO SUPPRESS EVIDENCE AND** |
| SHANNON WILLIAMS, et al, | ) | **STATEMENTS** |
| | ) | |
| Defendant. | ) | |

Shannon Williams moves the Court to dismiss the indictment pending against him or in the alternative to suppress certain evidence and statements obtained in violation of Williams' rights to due process, the assistance of counsel and other applicable law.  In support this motion, Williams shows the Court in part here what he expects the facts adduced at the evidentiary hearing he requests in connection with motion will demonstrate:

1.  Terry L. Haddock, an attorney licensed to practice law in Nebraska at the relevant times, was involved in a sexual relationship with Nyasha Muchegwa beginning on an unknown date but extending into at least the later part of 2008. Muchegwa was also romantically involved with Richard Conway, a government witness against Williams in the above-matter, during this time frame.  Haddock represented Muchegwa in various contexts, to include immigration proceedings, prior to October 5, 2008, when Muchegwa was arrested with Conway and others and charged in this Court the next day with conspiring to distribute more than 100 kilograms of marijuana.  She called Haddock the next day with the news.

2. Soon after, Haddock entered Muchegwa's apartment to retrieve money to be used for his retainer to represent Muchegwa on the conspiracy charge. There he discovered marijuana and one of Richard Conway's handguns, which he turned over to law enforcement. Haddock then entered his appearance on Muchegwa's behalf at her October 7, 2008, initial appearance on the Complaint filed in this Court and waived her right to a preliminary hearing. The government did not seek Muchegwa's detention at the hearing and she was released from custody that day on conditions.

3. Conway, a gang leader with a long criminal history who was the subject of a sealed firearm-related indictment at the time of his October 5 arrest, waived his detention and preliminary hearings in the marijuana case and his detention hearing in the firearm case and was accordingly ordered detained pending his trials. The late Eric Whitner, a lawyer who died August 22, 2009, appeared with Conway at those hearings as his retained counsel in both matters.

4. At this time Haddock, battling mental health issues and in the midst of divorce proceedings filed by his then-wife, was obsessed with Muchegwa and experiencing severe financial problems in part due to credit-funded expenditures he made for her benefit. Haddock advised her to cooperate with the government by sitting for a proffer interview, which she did. When the government dismissed the Complaint pending against her on October 22, 2009, without prejudice, its agents were aware of Haddock's illicit relationship and obsession with Muchegwa. On information and belief, Haddock agreed with the government to use his status as

an attorney to assist the government in criminal investigations in exchange for favorable treatment of Muchegwa by the government.

    5.  After Haddock delivered Conway's handgun he found in Muchegwa's residence to law enforcement, he soon began speaking with the represented Conway without the knowledge or permission of Mr. Whitner.  At the direction of the government, Haddock implored and otherwise persuaded Conway to cooperate against both Williams and Mr. Whitner, whom the government also suspected of wrongdoing, although Haddock never entered his appearance on Conway's behalf in either of Conway's pending cases.  While Mr. Whitner was still counsel of record for Conway, Haddock, unbeknownst to Mr. Whitner and at the direction of the government, began bringing a cell phone to Conway when the pair met without Mr. Whitner's knowledge at Douglas County Corrections.  Conway and Haddock used the cell phone to place calls to Williams, who was a fugitive at the time after a warrant was issued alleging he violated certain conditions of his supervised release from a 1994 sentence imposed for his role in a crack cocaine conspiracy.  Haddock actively participated in these calls, which were either purposefully not recorded by the government or recorded but not yet disclosed to Williams in discovery, and relayed, accurately or not, information disclosed by Williams during the calls to investigators.

    6.  Haddock during these calls convinced Williams Haddock was assisting in Conway's defense and that Conway was not cooperating with the government against Williams, about whom Conway claimed to possess incriminating

3

information.  Soon, Haddock was communicating with Williams by phone himself, outside the presence of Conway or government investigators, but with the knowledge of and at the direction of the government.  These calls were purposefully not recorded by the government or recorded but not yet disclosed to Williams in discovery.  During November, 2008, telephone discussions between Williams and Haddock, Haddock falsely informed Williams he could use his legal expertise to help Williams and other similarly situated African-Americans successfully challenge the then-prevailing crack cocaine/powder cocaine sentencing disparities Haddock knew, based on his discussions with Williams on the topic, Williams believed were race-based and offensive to the Constitution.  Haddock in fact had no such expertise, which the government knew.  Williams, who as noted was serving a crack sentence at the time, then paid Haddock through an intermediary $10,000.00 in currency, representing payment for a general retainer "in case anything came up" against Williams.  Haddock, who had previously complained to Williams of having financial problems, accepted the money.  During this time, Haddock was relaying "where appropriate" and "on Conway's behalf" information concerning these contacts, which were either purposefully not recorded by the government or recorded but not yet disclosed to Williams in discovery.

7.  More money followed.  Williams, through another intermediary, paid Haddock another $10,000.00, this time with $2,500.00 designated specifically for Haddock's "work" on the crack law attack with the other $7,500.00 adding to his general retainer to be used at Williams' direction.  Shortly thereafter, Williams paid

4

another $5,000.00 to Haddock through another intermediary, who even blessed Haddock at the time of the payment for Haddock's dogged efforts to rectify the disparate impact the prevailing law had on African-Americans, to compensate Haddock for his supposed continued research on the issue.  At no time did Haddock advise Williams he was unqualified to do this work or that he was not really doing it at all.

     8.  During this time period, to include December, 2008, Haddock claims Williams "called [Haddock] at home" to inform him of his intention to kill two of the witnesses against Conway in an effort to bolster Conway's chances at trial. Haddock, then purporting to act as an "Officer of the Court," believed it was his "sworn obligation" to "immediately" report to investigators this threat to kill multiple witnesses in a pending federal criminal prosecution.  The government, however, disclaimed the existence of any police report documenting Haddock's claim or documenting any investigation commenced or precautionary measure taken in response.

     9.  Williams was then arrested in Arizona January 19, 2009, following an incident at a residence there involving a distribution-sized quantity of marijuana. While in jail, Williams caused his son to communicate news of this development to his lawyer, Haddock, who immediately relayed the information to his handler investigators in Nebraska.  Haddock followed the same procedure when Williams' son contacted him again at Williams' direction to report news of Williams' release

from jail three days later. These calls were either purposefully not recorded by the government or recorded but not yet disclosed to Williams in discovery.

10. Haddock and Williams continued to communicate by telephone in the days following Williams' release from the Arizona jail, both about the legal implications of the circumstances surrounding Williams' arrest in Arizona and Haddock's progress on the crack cocaine sentencing challenge. Haddock, at the direction of the government, continued to provide investigators with information about Williams gleaned from these calls, including Williams' telephone number which investigators used to track Williams to Minneapolis, Minnesota, where they arrested him on his supervised release violation warrant on February 19, 2009. These calls were either purposefully not recorded by the government or recorded but not yet disclosed to Williams in discovery. Mr. Whitner, whom Williams knew had far more experience than Haddock defending federal criminal cases, entered his appearance of Williams' behalf in this Court on March 2, 2009.

11. Williams, who was transferred in custody on or about April 1, 2009, from Minnesota to Douglas County Corrections pending disposition of his supervised release violation allegations, was placed by the government, acting in concert with Douglas County Corrections, in the same cell as gang leader Conway upon his arrival there. Following Williams' arrival in Omaha, Haddock continued to attempt to initiate contact with Williams at the government's direction. Haddock eventually, using his attorney credentials, gained entry to Douglas County Corrections to meet with Williams on April 22, 2009, in the attorney/clergy visiting

6

area of the jail.  During this first meeting, and for many more meetings with Williams in the jail, Haddock was wired by the government to secretly record his discussions with Williams and discussions Williams had in Haddock's presence with others, discussions to which Haddock was not a party.

12.  Records produced by Douglas County Corrections pursuant to a subpoena served at Williams' request demonstrate Haddock had at least ten, and probably more, meetings with Williams in the attorney/clergy visiting area for which the government has provided no recordings to Williams in discovery.  Moreover, Williams, on information and belief, contends the government, like Williams, paid Haddock for services rendered throughout the course of the investigation of Williams.

13.  From and after November, 2008, Williams reasonably believed Haddock was acting and had been acting as his lawyer.  The recordings which have been disclosed by the government are replete with dozens of instances of Haddock referring to Williams as his client, including instances where Haddock, while speaking with others in the presence of Williams, refers to either himself as Williams' lawyer or Williams as Haddock's client.  Similarly, the recordings reveal many instances of Williams, in the presence of Haddock, referring to Haddock as Williams' lawyer in the absence of any protestation or correction from Haddock.  The recordings which have been disclosed also reveal Haddock offering Williams legal opinions and advice, not in furtherance of a crime or fraud.

14. During the limited period of Haddock's professional relationship with Williams for which recordings exist or have been disclosed, a period investigators purposefully limited or are limiting to conceal the manner in which Haddock and the government used Haddock's status as an attorney to gain access to Williams and to secure his trust for the purpose of tricking him into incriminating himself, Williams used telephones supplied to him by Haddock with the government's complicity to make statements which the government will attempt to use at trial to portray Williams as an unlicensed marijuana distributor. Discussions Williams had with others using this telephone directly revealed to investigators the identity of other persons involved in unlicensed marijuana distribution and who appear able, if not willing, to inculpate Williams. Without the information obtained in this manner, according to statements made by Haddock himself, the government would have been unable to prosecute Williams for anything other than violating certain conditions of his supervised release imposed in connection with his 1994 sentence in the crack conspiracy.

15. The above-described investigatory tactics, whereby the government hired a private lawyer, beset by conflicts of interests flowing from his representation of Muchegwa, Conway and Williams and other serious professional and personal problems, to form a legitimate attorney/client relationship with Williams for the sole purpose of exploiting that relationship to obtain incriminating evidence against Williams to attempt to prove a marijuana case, are outrageous and have inflicted and will continue to inflict unnecessary damage to the sanctity of the

attorney/client relationship and ultimately the integrity of the administration of justice if not specifically disapproved by this Court.

WHEREFORE, Williams, who does not require an interpreter, does not know whether any co-defendant should be present at or participate in the hearing and requests leave to file a post-hearing brief, and given the authorities cited in his brief filed herewith which he incorporates herein, moves the Court to convene an evidentiary hearing on this Motion of an estimated length to be determined following the government's response hereto, and thereafter for an Order:

16. Dismissing the indictment because the government engaged in outrageous pre-indictment conduct in violation of Williams' right to due process under the Fifth Amendment; or

17. Dismissing the indictment because the government engaged in outrageous pre-indictment but post-attachment conduct in violation of Williams' right to the assistance of counsel under the Sixth Amendment; or

18. Dismissing the indictment pursuant to the Court's supervisory powers to preserve the integrity of the administration of justice and to deter the government from engaging in similar conduct in the future; or

19. Suppressing any and all evidence, statements and live witness testimony obtained, directly or indirectly, by the government's exploitation of Haddock's professional relationship with Williams. Williams suggests this to include any and all evidence, statements and live witness testimony obtained by the government from and after the beginning of Haddock's professional relationship

9

with Williams, which began in November, 2008.  Williams more specifically contends suppression is appropriate, if the indictment is not dismissed, on the following grounds:

      a. As a remedy for the Fifth Amendment violation alleged above;

      b. As a remedy for the Sixth Amendment violation alleged above;

      c. As an exercise of the Court's supervisory powers to deter future governmental conduct of this nature;

      d. As a remedy for Haddock's serial, government-sanctioned violations of *NEGenR*. 1.7(b)(2), which directs attorneys to refrain from conduct unbecoming a member of the Bar of this Court; or

20.  Suppressing any and all communications intercepted by Haddock where Haddock was not a party to the communication, and any and all evidence, statements and live witness testimony derived directly or indirectly therefrom. Williams contends suppression of these communications and derivative evidence is appropriate pursuant to 18 *U.S.C.* §§2511(2)(c) and 2515 and the Fourth Amendment.

                                SHANNON WILLIAMS, Defendant,

                                By  */s/ Michael J. Tasset*
                                    His Attorney
                                    JOHNSON AND MOCK
                                    307 North Oakland Avenue
                                    P.O. Box 62
                                    Oakland, Nebraska  68045
                                    (402) 685-5647

## CERTIFICATE OF SERVICE

    I, Michael J. Tasset, hereby certify that on April 16, 2010, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent notification of such filing to Maria R. Moran, Assistant United States Attorney.

                                                          */s/ Michael J. Tasset*
                                                           Michael J. Tasset