IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 8:09CR457 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **POST-HEARING BRIEF IN** |
| | ) | **SUPPORT OF MOTION TO** |
| SHANNON WILLIAMS, | ) | **DISMISS** |
| | ) | |
| Defendant. | ) | |

Shannon Williams tenders this brief in support of his Motion to

Dismiss Indictment or to Suppress Evidence and Statements (Filing 213)

following the evidentiary hearings held thereon in December and August,

2010.  Regrettably the record of those hearings, while brimming with

testimony and documentary exhibits and audio recordings, is infected with

obfuscation and confounding contextual deficits.  At the same time,

however, the record tells quite a story and in the end reveals enough truth to

compel the granting of the Motion.  And that truth is this:  An ethically

oblivious, mentally ill lawyer, in the course of his representation of a co-

conspirator, gained evidence against Williams in violation of applicable rules

of professional conduct by lying to Williams and using his professional

relationship with Williams to trick Williams into incriminating himself and

then continued to portray himself as Williams' attorney at the same time he

was being paid to gather evidence against him, all to build a marijuana case.

And this:  The government orchestrated all of it.

1

That these truths are now evident is remarkable given the suspicious manner in which the investigation at issue was documented and disclosed by government agents and the incapacity for credible recall of several key witnesses.  Incredibly, there are no less than five missing or unplayable tapes of jail visits by Terry L. Haddock to Williams which Williams contends contain exculpatory evidence (probably ten hours worth, minimum), with no meaningful explanation from the government as to why.  Not worse but close, next to no police reports memorializing important events in the case were disclosed to Williams in discovery. In addition, the Douglas County Department of Corrections (DCC) allegedly experienced a catastrophic computer crash which allegedly destroyed for all time important records of the disturbing, extra-judicial wiring of attorney/client visiting rooms there, then an FBI agent alleged the only copy of the recordings made from the wiring was inadvertently destroyed.  Further, one of the three main case agents was in a car accident then was hit in the head by a soccer ball at a girls game which knocked him out of the hearings, a fact witness attributed her fuzzy long-term memory to her own car crash and a lieutenant at DCC, a pivotal law enforcement contact at the jail, drew a blank on at least the whole month of October, 2008, because he was "on a lot of medication" at the time.  And of course the government's star witness, Haddock, testified under oath his written response to a bar complaint where he stated, *inter alia*, "[m]uch of the time between November [2008] and February [2009] is a

haze in which the facts are not clear" was true and correct, a time frame which corresponds precisely to a crucial period in the government's investigation of Williams.

**I.  What the Government Did.**

The government's investigatory strategy in this matter was premised on its use of a lawyer, in his capacity as such and in the course of his representation of a co-conspirator, as an undercover agent to gain information from Williams it would not have gained but for the lawyer's lies to Williams and lawyer's status as a lawyer.  For it to work, the government needed a lawyer who would violate numerous ethical rules, specifically those relating to not continually lying to people, whether they be clients or third parties, and work for cheap.  In this case, by sheer happenstance it appears, the government found a mentally ill, ethically oblivious, down-on-his-luck lawyer who, upon proper motivation supplied by the government, was willing to play along.

If Williams' superseding indictment is permitted to stand, or if the evidence Haddock gained through his interactions with Williams is permitted to damage him at trial, it will be due to a finding by the judiciary that what happened here is compatible with the fair operation of the federal criminal justice system, that the government may induce, aid and abet a lawyer like Haddock to betray his profession and bring the bar into disrepute for the purpose of proving a marijuana case.

3

All of this is really unprecedented, and understandably so.  While Williams can and does cite cases where the government has encouraged or facilitated the commission of ethical violations by lawyers to gather evidence of crime, Williams does not cite a case on all fours with his.  Williams theorizes this is so for two reasons:  (1)  Prosecutors haven't hired a lawyer to do what was done here knowing courts charged with regulating the legal profession would not tolerate the damage to the profession's public image occasioned thereby and would not compromise the inviolate trust people seeking legal services must have in their lawyers for the system to function optimally, and (2)  There are not a lot of lawyers like Haddock willing to sell out themselves and their profession for $53,000.00.

Distilled, that is exactly what the government did here:  It bought Haddock's bar card for $53,000.00, used it to gain access to Williams and used the professional relationship Haddock cultivated with Williams and the lies Haddock told Williams to gain and then exploit Williams' trust to acquire evidence against him.  And while they were at it, they flooded the streets of Omaha with marijuana.

Williams, of course, is not without fault in this matter.  He fell for the government's sting.  He was duped by Haddock's feigned concern for him and other African-Americans impacted by the federal crack laws, he was tricked into thinking Haddock would observe the Rules of Professional Conduct and behave like a lawyer after he paid Haddock at least $17,500.00

and he fell victim to the government's plan for Haddock to gain his trust and his sympathies, by lying to him about freeing his nephew and Haddock's presentation of himself as desperate for money, so Williams would use Haddock's phone.  Williams does not and never has contended under prevailing law evidence of marijuana sales gleaned from calls he made in Haddock's presence at DCC are somehow privileged because of his professional relationship with Haddock.  He does contend, however, that his government and its attorneys should not be permitted to exploit a vulnerable lawyer like Haddock, and then encourage, sanction and indeed, join, his unethical conduct for the express and sole purpose of tricking Williams into providing evidence for a criminal prosecution for offenses which never would occurred but for the government doing so.

This clash between the unquestioned utility to the federal criminal justice system of the fundamental trust attending the attorney/client relationship and the government's ill-advised, poorly documented and cavalierly executed investigatory strategy has produced the perfect legal storm only the sanction of dismissal can quell.

## II.  Basic Background Facts.

Williams adduced during the hearings to date as many facts concerning the manner in which the government's investigation of him unfolded as were permitted given the lack of investigatory reports provided to him by the government prior to those hearings and the limited credible

5

recall capacities of key witnesses, including Haddock.  They can be summarized as follows:

By at least as early as October, 2008, law enforcement believed Williams was promoting marijuana sales in the greater Omaha area in concert with members of the South Family Bloods, a local street gang.  Williams was a fugitive at that time, having absconded from supervised release conditions imposed in connection with a federal sentence of imprisonment stemming from a 1994 crack cocaine conspiracy conviction.  John Stuck, a detective with the Bellevue, Nebraska police department, was tracking leads provided to law enforcement through the early part of 2008 relating to South Family marijuana sales and worked those leads in cooperation with other law enforcement agencies.  On October 5, 2008, a break occurred in the investigation when Richard Conway, a sometime partner with Williams in the marijuana business, was arrested in a Target parking lot in Omaha following the controlled delivery to that location of more than three hundred pounds of marijuana.  The load was delivered by Steve Kissenberth, who had been stopped with it by police in Illinois.

Conway, a rival gang leader who met Williams in a halfway house in 2005, had federal warrants for a gun case and his own supervised release violation at the time of his October 5, 2008, arrest.  He was represented in connection with those warrants and for the charges filed in the aftermath of the Target bust by Eric Whitner, a lawyer who died (of natural causes) on

August 22, 2009.  Conway hired Whitner in June, 2008, after meeting with him and Williams to discuss the June 12, 2008, warrant search of Conway's house where a gun and $59,085.00 was seized by law enforcement resulting in the above-mentioned warrants.

Conway took the position at the hearings, without one bit of corroborating evidence, that Whitner and Williams were co-conspirators in the marijuana business prior to October, 2008.  Conway claimed that he, Williams and Kissenberth, the load driver, agreed prior to the Target incident that if Kissenberth was stopped by law enforcement with a load, Kissenberth would tell authorities the load belonged to Darrel Taylor, not to Conway or Williams.  After Conway was arrested at the Target, Conway testified he went with Whitner to a proffer interview where he falsely informed authorities the load belonged to Taylor in accordance with this plan.  On the way back to the jail from the proffer, Conway claimed he told law enforcement he lied during the proffer because he did not want to implicate Williams in front of Whitner because he believed Whitner would inform Williams Conway was cooperating against him.

Conway's girlfriend, Nyasha Muchegwa, was arrested October 5 with Conway having fled the Target parking lot after authorities, who were monitoring and controlling the delivery of the marijuana load, observed her acting as a lookout.  She, along with Conway, Kissenberth, Taylor and John Oglesby were charged in this Court the next day with conspiracy.

Muchegwa had a sexual relationship with Haddock, and Haddock had previously served as the Muchegwa family lawyer.  Muchegwa's mother contacted Haddock the night of her arrest, and Haddock appeared at DCC to meet with Muchegwa the next day.  Upon Haddock's inquiry regarding fees, Muchegwa indicated Conway would pay them and directed Haddock to her apartment to retrieve money Conway had apparently stored there.  Prior to leaving DCC, Haddock verified with Conway, who was meeting with Whitner a couple of doors down in the attorney/clergy visiting area of DCC, that Conway would pay Muchegwa's fees and that there was money under a bed in her apartment.  According to Conway, when Haddock "stuck his head in the door" of the visiting room, Haddock looked like he wanted to kill Conway.

That night, Haddock went to Muchegwa's apartment with Muchegwa's mother and friend.  A handgun belonging to convicted-felon Conway was found under the bed and a small amount a marijuana was located elsewhere in the apartment.  Haddock testified he flushed the marijuana down the toilet and took the gun to his office after unloading it.

Haddock appeared with Muchegwa at her arraignment on the complaint filed against her in this Court where Muchegwa waived her right to a preliminary hearing and was released on conditions.  Haddock arranged a proffer interview for Muchegwa with investigators which occurred on October 16, 2008.  Apparently Muchegwa denied knowing participation in

8

the alleged conspiracy at the interview, and while Williams has not been granted access to a report of the interview, it is reasonable to conclude Muchegwa also told officers during the interview the handgun Haddock found under her bed belonged to Conway. (1484:6-1485:10)  Haddock arranged at the interview for the immediate delivery to law enforcement of Conway's gun which Haddock apparently had been keeping at his law office.

The complaint against Muchegwa was dismissed, without prejudice, on October 22, 2008 (8:08MJ185, Filing 33), but Conway was indicted that day for conspiracy to distribute marijuana along with Kissenberth and Oglesby.  (8:08CR380, Filing 28)  Count III of the indictment sought forfeiture of the $59,085.00 seized from Conway's house on June 12, 2008.  (*Id.*)  Whitner appeared as Conway's counsel at his arraignment November 5, 2008.  (8:08CR380, Filing 39)

Prior to his November 5 arraignment on the indictment, and apparently prior to the time the indictment was filed on October 22, 2008, Haddock met with Conway at Conway's request at DCC because Conway wanted to hire Haddock to represent him because Conway did not trust Whitner. Haddock claimed he demurred in the first meeting because he perceived a conflict of interest between Conway and Muchegwa, who Haddock was representing on her then-pending federal complaint.  After Muchegwa's case was dismissed without prejudice on October 22, Haddock met with Conway at DCC four times between then and November 5, 2008.  During the first of

9

these meetings, Haddock claims he also told Conway he could not represent

him because he was already represented by Whitner.  Haddock then claimed

Conway called him the next day to tell him Whitner had agreed Haddock

could be co-counsel for Conway.  Haddock never communicated at any time

with Whitner about this supposed arrangement.  At that time, co-counsel

Haddock accepted money from Conway as payment for his services (and

some more in January, 2009), which he did not share with his law firm,

Raynor, Rensch and Pfeiffer, in violation of Haddock's employment

agreement with the firm.

In violation of DCC regulations, Haddock began smuggling a cell phone

into his jail meetings with Conway on October 22, 2008.  (416:25-417:4)

He did not have permission from DCC or from law enforcement or from

anyone else to do so.  (851:2-24) (56:1-17) (1501:11-1502:17)  Haddock's

phone was used by Haddock and Conway from DCC to call, among other

people, Williams, and they also called Stuck to relay information about

Williams, including Williams' telephone numbers.

Law enforcement then equipped Conway, a federal detainee, with a

secret recording device Conway used to record an October 29, 2008,

meeting with Whitner at DCC.  The meeting did not go as planned and no

information corroborating Conway's conspiracy claim against Whitner was

obtained.  Whitner, apparently thereafter suspicious of Conway, stopped

meeting with Conway at DCC and brought in Michael Gooch as yet more co-

counsel for Conway.  Conway in August testified he did not have contact with Whitner after the October 29 recording, but changed his tune by the time of his appearance in the December hearings, claiming he met with Whitner one other time in December, 2008, where yet another recording was allegedly made which is the subject of a separate filing.

During the month of November, 2008, Conway and Haddock, using Haddock's cell phone, had regular contact with Williams from DCC.  During these calls, Haddock, Williams and Conway would discuss Williams' and Conway's legal situation and formulate joint defense strategies.  (1538:6-1539:9)  Haddock and Conway would then relay information about the calls to Stuck, including the telephone numbers used by Williams during the calls.  Haddock, in the course of representing Conway, never informed Williams Conway was cooperating against Williams or that Haddock was relaying information gained during the calls to law enforcement.  (1541:15-21)

Later in November, Williams and Haddock began speaking by telephone outside of DCC and the presence of Conway.  According to Haddock, at first Williams had his "guard up" during these calls but opened up more as the two conversed.  The calls, some of which lasted for hours, concerned legal matters, including Conway's case, and particularly centered on Haddock's analysis and opinion of the constitutionality of the then-prevailing federal crack laws.  Williams, who at the time as noted was on supervised release for his 1994 conviction and sentence in a crack case, was

11

particularly interested in issues bearing on the constitutionality of those laws.

Haddock continued to provide information concerning his calls with Williams

to law enforcement as they occurred.

On or about an unknown date, supposedly in December, 2008,

Haddock swore Williams called him at home, whereupon the two discussed

the evidence against Conway.  Haddock claimed Williams offered during that

call to kill two of the witnesses against Conway to increase Conway's

chances of a favorable outcome in his case.  Haddock further claimed he

immediately notified Stuck of Williams' plan.  Conway, too, claimed

knowledge of Williams' supposed offer, except he testified Williams told him

and Haddock about it during one their meetings at DCC.  Stuck, for his part

and in conformance with his practice in the investigation, authored no report

of receiving the information from either Haddock or Conway and took no

other action in connection with the information because, as he put it,

Conway assured him Conway had instructed Williams not to proceed with

the killings.  Around this time, Stuck and other law enforcement officers

took the opportunity to inform Haddock, without foundation of any kind,

Williams was a "five time murderer."

By the second week of January, 2009, Haddock began receiving lots

of money from Williams.  On or about the 12th, Haddock received

$10,000.00 in currency to be used, according to Haddock, for Conway's

representation and another $2,000.00 to $2,500.00 as a gift to Haddock

from Williams.  Haddock maintained the gift occurred after Haddock had informed Williams in a prior phone call a state court judge had shorted Haddock that amount on a court-appointment voucher.  Within a day or two of these payments, yet another $5,000.00 in currency was delivered to Haddock by Fred Lewis.  Haddock assumed all these funds were proceeds from illegal drug sales.  He also testified he told Stuck of his receipt of all the money and that he kept the substantial portion of it (he gave $5,000.00 to Stu Dornan, still more co-counsel for Conway) without sharing it with his law firm as required by his employment agreement there.  Haddock lied at the hearings concerning the purpose of the $5,000.00 payment delivered by Lewis.

Shortly after the $5,000.00 Lewis payment, Williams was arrested in Arizona because authorities there believed he was a person named Donald Jarmon, who had allegedly been in possession of a distribution-sized quantity of marijuana.  Williams' son called, of all people, Haddock, to inform him of this development.  Haddock then called Stuck to relay the news of Williams' arrest, but Williams was released from jail soon after, before Nebraska authorities could lodge a hold.  Williams then called Haddock to tell him he had been released and to arrange a lunch meeting in Omaha.  Haddock informed law enforcement, and surveillance was set up at the restaurant where the meeting was to have occurred.  Williams never showed, but

maintained phone contact with Haddock, who continued to pass Williams' phone numbers to law enforcement.

Williams was then arrested February 19, 2009, in Minnesota on his supervised release warrant using a phone number Haddock supplied to law enforcement.  Upon his transfer in custody to the District of Nebraska, law enforcement arranged for him to be placed in the same jail cell as Conway for the purpose of permitting Conway to secretly record Williams.  Conway testified the idea to record Williams was his; Haddock disagreed, claiming it was his idea.  Regardless, Conway did record Williams at DCC on April 1, 2009, and statements made by Williams on that recording are the subject of a separate motion filed herein.

After that recording, on or about April 13, 2009, Haddock claims he came up with the idea to record Williams himself at DCC, whereupon law enforcement made arrangements to gain approval to equip Haddock with a recording device and to send him into DCC to meet with and record Williams. Haddock, who did not present at the hearings well-versed in the Rules of Professional Conduct, did not consult with outside counsel concerning the ethical implications of doing so.  FBI Agent Nellis, in charge of securing approval to use Haddock in this fashion, thought it was important to inform his superiors Haddock did not represent Williams, but did no investigation on his own to confirm that and instead relied on Stuck's opinion on the issue.  It is apparent from the testimony discussion between law enforcement

14

(including Haddock) and the government's lawyers of the application of the Rules of Professional Conduct to the plan to use Haddock was cursory at best. Haddock, for his part, admitted "there wasn't much arrangements" made between him and law enforcement prior to the first recording on April 22, 2009.

Haddock and law enforcement testified all sixty-plus meetings between Haddock and Williams at the jail, spanning the period between April 22, 2009, and December 17, 2009, were recorded and that law enforcement listened to the recordings more or less as they were made, but Haddock admitted he and Williams during that period had telephone discussions which were not recorded. Moreover, as noted by separate filing herein, Williams documented five different meetings at DCC for which no tape recordings have been disclosed or for which a tape exists but confoundingly cannot be played.

Haddock also admitted, and Conway agreed, Haddock teamed up with law enforcement against Williams in an effort to secure a sentence reduction for Conway. There is no testimony in the record law enforcement informed Haddock at any time his cooperation would not be so credited. Conway described Haddock's efforts as motivated by and potentially resulting in a form of relief for Conway he termed a "third party credit," whereby Conway stood to receive a sentence reduction, in addition to whatever reduction flowed from his own cooperation, from Haddock's efforts during the course

of his representation of him.  Haddock was also clearly moved to act against Williams when informed by government agents, again without foundation of any kind, Williams was a "five-time murderer," as Haddock testified "that phrase kept going through [his] mind" during his deliberations over whether to assist Conway by recording Williams at DCC.  (878:10-882:8)  Williams concludes the government employed this smear tactic to not only sway the vulnerable Haddock, but also to serve later in court to justify the means it employed to indict Williams.

The DCC recording operation thus commenced on April 22, 2009, with Haddock generally meeting with law enforcement prior to entering DCC to get the recording device and to discuss the investigation.  Some, but not all, of these preparatory discussions with law enforcement were recorded. Over the course of their many meetings at DCC, Haddock would pump Williams for information concerning the status of Williams' pending supervised release violation case and the charges against him in Arizona, record discussions Williams had with his counsel of record in that matter, Steven J. Lefler, concerning Williams' defense strategies without informing Lefler and provide legal analysis and advice to Williams at Williams' request, not in furtherance of a crime or fraud.

Williams and ten others were charged by sealed indictment December 16, 2009, the day before the last DCC recording was made, with conspiring to distribute more than 1000 kilograms of marijuana and money laundering.

Williams went on television shortly thereafter to tell everyone watching he had hired Haddock to get him out of jail.  (Gov. Ex. 23)

**III.  The Big Lie.**

The record clearly reveals the payment by Williams to Haddock, through intermediaries, of at least three sums of money:  (1) $10,000.00 in currency on or about January 12, 2009, to be used according to Haddock to defray Conway's legal expenses; (2) $2,500.00, also in cash, that same day for what Haddock characterized as a gift; and (3) $5,000.00 the next day, which Haddock (and Stuck, too) variously claimed and attempted to claim Haddock knew *at the time of its receipt* was intended to pay for the representation of someone other than Williams.

The June 1, 2009, tape, received in evidence as Government's Exhibit 3, contains the only discussion (disclosed by the government) between Williams and Haddock concerning the above-referenced $5,000.00 payment Williams made to Haddock.  The meaning of their taped exchange, if it can be called that due to Haddock's blatant attempts to prevent Williams from speaking at crucial times, cannot be reconciled with the government's defense of its investigatory conduct.

It is as clear as it can be:  On that tape at 16:38:40, Haddock tells Williams Haddock received the $5,000.00 from Williams' friend, Fred Lewis, who told Haddock at the time "I hear you're doing this and, you know, you're researching this and the discrepancy and, you know, helping our

17

friend." Haddock, on the tape then tells Williams, with feeling as Williams

hears it, his response to Lewis was **"I thought 'our friend' was you."**

Haddock then informs Williams that Williams disappeared "at that point in

time" and goes on to tell Williams Haddock never received any marching

orders for the money. Williams then, without refutation from Haddock, tells

Haddock it was "up in the air" as to what services Williams would direct

Haddock provide for having received the money.

Williams does not know he is being recorded. Haddock knows they

both are. (1749:6-8) There is no contradiction or disagreement expressed at

any time by Haddock concerning Williams' statement about the $5,000.00

being what can only be characterized as a special retainer. It is also obvious

Haddock was doing his best to truncate further discussion on the topic, to

the point where a somewhat exasperated yet polite Williams simply gives up

and moves on to make another call. If Williams knew he was being

recorded, one would bet that would not have been the end of it.

Haddock and the government took the disingenuous position at the

hearings Haddock knew all along the $5,000.00 was payment for the

representation of someone other than Williams, and accordingly, their

defense goes, the payment to Haddock of the $5,000.00 could not have

created a professional relationship between Williams and Haddock. While

Haddock's nonsensical attempts to explain the "I thought our friend was

you" evidence could be considered comedic in another context, here, in the

context of sober, judicial review of the unprecedented, system-threatening investigatory tactics at issue, his explanations present instead as sinister lies.

Williams identifies as lies the following testimony by Haddock, adduced both by himself and the government, on this issue:  Haddock's response to the government's lawyer during his direct examination on August 19, 2010 (500:19-501:9); and Haddock's utterances on cross-examination December 20, 2010 (1741:18-1743:8) and (1745:20-1746:9).

No amount of purposeful but meritless objecting or argument from the government could clear a federal courtroom of the smoke coming from the evidentiary gun that is Gov. Ex. 3.  No amount of double-talking by Haddock or hollow bolstering by Stuck (see, 888:14-889:12) changes the evidence on that June 1 tape.  Haddock knew at the time Fred Lewis gave him the $5,000.00 Williams was the client for whom the legal services thus paid for were to be supplied.  Haddock simply messed up under pressure and admitted it on the June 1 tape.  Of course, Williams knew it as well, telling Haddock on the tape it was "up in the air" as to what services Williams would direct Haddock to perform.  No rejoinder from Haddock then occurred; no counter-explanation was offered.  The obvious reason:  Haddock knew Williams would call him on it if he tried.

Of course, the $5,000.00 payment is dispositive because the government seems to agree if Haddock was Williams' lawyer, it never would have gained approval from the powers that be to exploit Haddock in the

19

fashion it did.  (198:1-9) (634:14-636:7)  The government, whose agents

listened to the tapes as they were being made (but tellingly selectively: see,

(639:24-642:15)) and reported regularly to the government's lawyers,

elected to simply press on with the investigation in the face of June 1 (and

April 22 and everything else treated below) and to then put its case in

Haddock's hands at the "we knew we'd be here" motion hearings.  (232:10-

11)  That Haddock was not up to the task is understandable; truth on tape is

a formidable opponent.

One of the advantages to the government of its agents not writing

investigatory reports documenting their interactions with Haddock,

particularly during the November, 2008 to April, 2009, timeframe for which

recordings do not exist, is that government witnesses can try to use the

recordings that do exist to support a version of those prior unrecorded,

undocumented events which suits the government's present defense of the

tactics at issue.  This is what is going on with the testimony pertaining to

the June 1 tape.  As Haddock admits at 16:31:35 on that tape, Conway,

who was jailed with Williams, told Haddock Williams was asking about the

status of the work.  It is in fact Conway who tells Haddock Williams is

disappointed and Conway is the one who tells Haddock, before Haddock

meets with Williams on June 1, 2009, that Williams is going to tell Haddock

the work was to be done for Dion because Williams believed he would have

20

a better argument to get his money back from the incompetent Haddock if he told him the retainer was to be used to help somebody else.

Evidence corroborating this reality can be found on track 1 of Def. Ex. 136, a recording of Haddock and Conway discussing a previously hatched plan to attempt to absolve Haddock and the government from the ramifications of the attorney/client relationship consummated between Williams and Haddock with the January, 2009, $5,000.00 payment. Conway knew from his discussions with Williams in jail Williams was going to tell Haddock the Dion story and provided this information to Haddock ahead of time.  That is why Haddock appears unsurprised when Williams speaks of Dion during the meeting, not because Haddock knew in January about the about the then-unnamed Dion.  Again, the "I thought 'our friend' was you" evidence looms large over this issue and this entire case.  It is only because law enforcement, which knew of Haddock's receipt of the money at or near the time he received it, did not author a contemporaneous report detailing the purpose for which Haddock received the $5,000.00 that Haddock and other government witnesses could later claim that Haddock knew all along the retainer was for a client other than Williams.  Williams is simply lucky Haddock made a mistake and admitted on Gov. Ex. 3 that he believed Williams was his client as early as January, 2009.

Finally, it cannot be ignored Haddock tells Williams, at the end of their discussion on the topic, that Haddock would go back to the drawing board

get the finished product to Williams himself, not to Dion, when "it's done." Haddock never even asks for Dion's last name, let alone any contact information for his supposed "client" and Haddock never at any time disabuses Williams of Williams' stated impression the money was for an "up in the air" special retainer. The opportunity was obviously there, but the government's desire to keep the cover going, to perpetuate its ruse, was stronger than its willingness to risk challenging Williams with one too many lies.

On a par with Haddock and the government's attempt to obfuscate the meaning of the "I thought 'our friend' was you" evidence was his explanation of what he actually did to begin to earn the $5,000.00 Williams paid him. Haddock, a lawyer for nine years, explained to the Court and all the lawyers and clerks listening on December 20, 2010, that his plan of attack on the crack laws during the four and one-half months between the time he received Williams' money in January and June 1 consisted of reviewing an eleven year old paper he wrote as an undergrad on something having to do with crack and printing some stuff off the internet. Haddock testified this material would then somehow transform into a "scholarly article, maybe law review article" which in turn would "spring into an appeal" which could be joined by anyone, like Williams, "who had a crack cocaine conspiracy charge against them."

Williams did his best at the hearing to keep a straight face while listening to this testimony and exercised restraint when Haddock likened his approach to "appeals or briefs or things like that" to "artwork where you draw with pencil on the canvas before you start painting."  (1745:16-19) Leaving aside the merits of a legal strategy to secure a crack defendant's release from jail by writing a scholarly article, Haddock also admitted he read no published opinions on point and the material he did provide was apparently so ridiculously and obviously unhelpful the layman Williams called Haddock on it right off the bat.  Williams submits here what he admittedly argued during Haddock's testimony on this topic:  This whole research sham, in retrospect with the benefit of hindsight, was simply a set of amateurishly transparent lies told to trick Williams into continuing to believe Haddock was working for him as his lawyer so Haddock could continue to gather for the government evidence it would not otherwise have gained to indict Williams on marijuana charges.

Williams did in fact make the use he could of the work he paid Haddock to perform with a *pro se* habeas filing August 4, 2009, under Case No. 8:09CV262 in this Court.  Williams again requests the same be judicially noted.  (1094:11-1095:5)  The fact of this filing defeats the government's argument Williams had nothing to gain by hiring Haddock in January, 2009, to help get him out of jail.  Williams obviously knew he was in jail over a crack case and believed his chances of getting out would be enhanced if a

judge found the laws under which he was convicted were unconstitutional. He also knew by then he would have a very long wait in jail before Haddock's "scholarly article/springing into an appeal" strategy would bear fruit.  It is reasonable to conclude, particularly given the undisclosed or unplayable tapes, to include the June 11 tape, that Williams' further discussions with Haddock on this issue caused Williams to believe Haddock was doing what he could for him, but Williams was better off getting things started by himself.

In the end, and as the government's witnesses admitted, the government wanted to "keep the cover going" and did not want to tip off Williams or raise his suspicions as to where Haddock's loyalties lied.  This government-sponsored "I'm acting like I'm your lawyer but I'm really not" brand of subterfuge is endemic to and pervades the investigatory strategy employed throughout this investigation and, because it threatens the integrity of the bar and the courts and therefore the interests of the people they serve, it must be specifically disapproved by dismissing Williams' superseding indictment.

**IV.  Other Big Lies.**

Lawyers do not lie.  Not to their clients, not to prospective clients, not to third parties when it suits their client's interests, not to the Counsel for Discipline and not to a federal judge during a pretrial evidentiary hearing.

Unsurprisingly, Haddock doesn't think lawyers "necessarily have to be truthful to third parties."  (1642:2-6)

The government relies on the first meeting between Haddock and Williams at DCC to support its defense to Williams' claims.  That first meeting, where Haddock was to ensure Williams understood beyond any doubt Haddock was not his lawyer, was the government's proffered setup for everything that was to come.  Of course, Williams knows now the set-up began long before then, back in October, 2008, when Haddock with the knowledge and approval of law enforcement began gathering and providing evidence against Williams during phone calls between Haddock, Conway and Williams where joint defense strategies between Conway and Williams were discussed, and then throughout December, 2008, and January, 2009, when Haddock would relay to law enforcement for Conway's benefit information he gleaned from his professional dealings with Williams.  But Williams nonetheless agrees that first recorded meeting is important.  His assessment of it, however, differs from the government's.

It must be observed at the outset the record reflects very little thought was given by the government, or Haddock, for that matter, to the implications and potential pitfalls of the government's chosen strategy to indict Williams.  The law enforcement officers listening to the tapes as they were being made admittedly only listened for evidence of criminal conspiracy, not for evidence of an attorney/client relationship, although in

25

their defense they admitted they did not know what to listen for on that issue in any event. (631:11-632:16) (899:19-900:6)  The government agents, including Haddock, were largely oblivious to even the most basic rules of professional conduct lawyers swear to abide by, and none laid claim to having studied them or even discussed them much ahead of time. Haddock, for his part, did not consult the Counsel for Discipline, with whom he had previous professional dealings, or outside counsel of any kind prior to signing the papers Agent Nellis presented him on their first in-person meeting that first day and further admitted there just "wasn't much arrangements" made by the government to prepare him for his complicated new side job. There were no formal measures taken to protect Williams' discussions with Lefler from disclosure to the government lawyers prosecuting him on matters relating thereto.  And, without asserting it was required, there is no evidence the government sought input from the judiciary concerning the propriety of this undeniably novel part of its operation.

The DCC recording operation commenced April 22, 2009.  Ill-advised, unprepared, "flying by the seat of [his] pants" and scared, Haddock started lying to Williams in an effort to benefit his client Conway almost immediately after the two sat down.  (1661:3-8)  First off, in an admitted effort to cement Williams' trust, Haddock falsely implies to Williams Haddock performed legal services for Tyreese Phillips, Williams' nephew, pursuant to Williams' previous request.  (1571:12-1579:2)  This lie, like all the others,

26

occurred with the knowledge and approval of the government as Haddock

had, prior to April 22, 2009, told Stuck of Williams' request for Haddock to

represent Phillips.  (*Id.*)  Inexplicably, although Stuck for obvious reasons told

Haddock at the time Haddock first broached this subject with him not to

actually get involved in representing Phillips, Stuck and the government

nonetheless determined there was nothing wrong with Haddock falsely

representing to Williams on tape that he did.  (*Id.*)  This is a slight, yet

immaterial, variation on the "I'm acting like I'm your lawyer but I'm really

not" brand of subterfuge plaguing the investigation.  Because Haddock told

this material lie during the course of his representation of Conway, Haddock

in so doing engaged in professional misconduct.  *Neb. Ct. R. of Prof. Cond.*

§§3-504.1 and 3-508.4; *NEGenR* 1.7(b)(2)(A).

Next, Haddock very specifically informs Williams Haddock is not and

cannot be Conway's lawyer and explains he just visits Conway because he,

as a lawyer, has access to the attorney/clergy visiting area of DCC where

Conway was being held.  (Gov. Ex. 1, 14:29:52 to 14:30:09)  This, of

course, is also a fundamental, material lie.  Haddock was in fact representing

Conway all along and uninterruptedly, from and after October 22, 2008, and

was in fact actively engaged in garnering Conway a sentence reduction by

working for the government against Williams at the time that false statement

was made.  Williams, leaving aside for the moment that he, too, was

Haddock's client on April 22 due to the $5,000.00 special retainer he paid in

January, 2009, was certainly an unrepresented person due to his preceding statements on the tape about firing Whitner (see, *Neb. Ct. R. of Prof. Cond.* §3-504.3) or, barring that, at the very least a third person as contemplated by *Neb. Ct. R. of Prof. Cond.* §3-504.1.  If Haddock and the government's lawyers, through *Neb. Ct. R. of Prof. Cond.* §3-508.4(a), honor those rules in their dealings with Williams, this case never happens.

Turning to the efficacy of the April 22 set-up, which the government's witnesses pronounced a complete success in court, the reality is it was anything but.  For starters, the first thing Haddock does on the tape, after asking Williams to detail the status of any legal proceedings lodged against him that is, is reiterate the legal advice he had previously given Williams to flee to Belize to avoid punishment for his alleged supervised release violations.  Haddock, of course, memorably revealed for the first time at the December hearings that during their previous Belize discussion referred to on the April 22 tape, he explained to Williams his understanding of whether one could be extradited to the United States from that tropical nation and importantly further admitted he gave the extradition advice in response to Williams' specific request for the same.  (1646:21-1647:17) Notwithstanding the previous in-depth crack law discussions leading to Williams' payment of the $5,000.00 special retainer and Williams' nephew/family lawyer argument, this one exchange should have put anyone listening on notice Agent Nellis' statement to his superiors (Gov't Ex. 15) to

gain approval for Haddock's consensual monitoring of Williams that "Terry Haddock does not represent Williams" was false.  In fact, Haddock, by reinforcing his previously given advice at the outset of the April 22 meeting ("What did I tell you?  Belize.  I told you, Belize.") was continuing to act as Williams' lawyer even then, right at the time he is supposed to be doing everything he can to make it appear he is not.  Agent Nellis, however, did nothing to alert his superiors the operative statement in his written authorization request was thus inaccurate, perhaps because as he testified under oath he thought all along Haddock used the word "police," not "Belize," in that exchange.  (685:25-687:18)  Lawful testimony cannot be more specious than that.

The fundamental problem thereafter with Haddock's attempt to discharge his government-issued assignment on April 22 is that he qualified and undermined his statements to Williams about not being his lawyer by conditioning those statements on the status of Williams' relationship with Whitner.  By couching his concerns about appearing to be Williams' lawyer in the context of avoiding potential problems with Whitner, Haddock succeeds in only making Williams reasonably believe his "I'm not your attorney" protestations are simply a cover story Haddock is using to avoid those problems with Whitner.  That is why, at 14:28:06 on the tape, Williams expresses his understanding that Haddock's statements are intended merely to provide cover for Haddock from trouble with Whitner, and not understood

29

by Williams to dissolve the professional relationship they had up to that point or would have beyond.  Haddock even says himself on the tape at 14:29:15, after Williams has already told Haddock in no uncertain terms he is quitting Whitner, that "*until [Whitner] is completely out of here*, I have nothing to do with being your attorney…"  The evidence thus demonstrates Haddock failed miserably in his first tape-recorded assignment.  It would not be the last time, clearly.

Before moving on, Williams notes his clearly audible statement to Haddock regarding Williams' understanding of Haddock's cover story described above ("[b]ut to cover your ass" is how he put it) did not make it into Gov. Ex. 1T, the official government transcript prepared by and offered in evidence as an "aid to the Court" by his government and received in evidence as such by the magistrate judge at the hearings in August.  Even Haddock, who claimed situational hearing difficulties at the December hearings, was able to hear and confirm the making of this crucial statement by Williams.  (1656:21-22)  The fact that the government with all its resources did not, particularly given its defense as Williams understands it rests in large part on this very tape-recorded exchange, and particularly in view of the fact there are *other whole jail meetings* between Haddock and Williams which are unaccounted for, gives Williams the chills.

### V.  Terry L. Haddock

Williams struggles to conceive of a less credible lawyer/witness than Haddock.  Admittedly afflicted with medically diagnosed mental illness which caused memory malfunction during the exact, crucial period in the investigation for which neither tapes nor police reports exist, still trying to get his client and personal friend Conway a sentence reduction and all the while doing everything he can to avoid disbarment, Haddock approached the witness stand with enough baggage to turn the head of a traveling Saudi prince.

From the stand, because he had to, Haddock authenticated his medical records, received in evidence under seal (Def. Ex. 137), and adopted as truth the responses he made to the Counsel for Discipline concerning two separate bar complaints:  One lodged by a state court district judge in 2009 (Def. Ex. 138) and the other by Williams after the filing of his indictment (Def. Ex. 139).  Because the bar complaint responses, like the medical records, were received under seal as well Williams does not detail them here, but instead invites the Court to judge Haddock's credibility in the light thrown by what Haddock stated, and what he did not reveal, to the Counsel for Discipline in both responses and by the professional opinions of his hard-working mental health team.

Because there was testimony in open court concerning certain statements Haddock made to the Counsel for Discipline about his memory,

Williams elects to feature that testimony here:  Haddock swore that "[m]uch of the time between November [2008] and February [2009] is a haze in which the facts are not clear."  (Def. Ex. 138, p. 5) (1449:15-1452:8)  To be sure, there are many more true details provided by Haddock in that response about his mental condition during the period relevant to Williams' motions, all of which could not be more damaging.  But for Haddock to specifically swear that for the exact November to February time period so critical to Williams' defense he was in a medically confirmed haze in which the "facts are not clear" must at minimum give long pause to, or prevent altogether as a matter of law, a Court charged with determining whether to credit his testimony or any material part thereof.

Haddock's response to Williams' complaint (Def. Ex. 139) is just as destructive to Haddock and the government.  Recognizing it is sealed, Williams does not quote it directly, but instead invites the Court to review it to determine whether Haddock was truthful with the Counsel in that response and therefore truthful with the Court given Haddock's under-oath adoption of it at the hearings, his other testimony and the testimony of the other government witnesses, to include Stuck.  A certain glaring yet predictable and compulsory omission from Haddock's response serves as the starting point for this unhappy task.

That omission, of course, is the "I thought 'our friend' was you" statement Haddock makes to Williams on the June 1 tape.  While Haddock

32

takes pains on page three of Def. Ex. 139 to quote extensively from the June 1 tape, he obviously cannot, and therefore does not, inform the Counsel he uttered this revelatory statement.  The simple fact is there is no license-saving or, indeed, indictment-saving, explanation for it, and if there was, the Court would have heard it by now given all the evidence adduced in this matter to this point.  Haddock knows the lawyer's duty to tell the truth to the Counsel for Discipline (1449:15-21); Williams' simple contention is that the desperate Haddock, who clearly had access to and used the June 1 tape when preparing his response, chose by omitting the statement to shirk his duty and kick that can down the road in the hopes no one would ever find it.

And that is not the only lie the evidence shows he told the Counsel, and in turn this Court, in the Williams response.  Haddock in fact did not have law enforcement permission to bring in phone in to DCC at all relevant times.  He flat-out lied about this under oath at the August hearings (413:13-22), lied about it in December (1641:3-1643:6) and lied about it on pages two and four of Def. Ex. 139. (1501:11-1502:17) (56:13-17) (61:7-13) (851:2-19)  The government also got this one wrong in its response to Williams' dismissal motion.  (Filing 265, p. 4)  Haddock also either lied to the Counsel on page one of Def. Ex. 139, or to the Court, one or the other, about what he did prior to advising Conway to cooperate with the government against Williams.  (1499:13-1500:7)  And Williams submits

Haddock's statement on page one of Def. Ex. 139 describing how he came to be "co-counsel" with Whitner is, at a minimum, misleading given Haddock's claims at the hearing the "co-counsel" arrangement was brokered through Conway without Haddock ever communicating with Whitner.

And as if all the above is not enough, Haddock also stole money from his law firm (1455:15-1463:12) (1746:25-1747:2) and chose to lead the Counsel for Discipline to believe his participation in the DCC recording operation was motivated solely by a desire to benefit society, not his client Conway.  (Def. Ex. 139, pg. 1)  And, of course, Haddock failed to report in that response all the lies he told Williams in the course of his representation of that felon.

Turning, then, to the testimony regarding Haddock's motivation for teaming up with the government, the record leaves Williams sensing more than a moderate amount of evidentiary evolution occurring over the substantial period of time he has been investigated and prosecuted.  His description of this phenomenon begins with Stuck's grand jury testimony, provided to Williams upon his *Jencks*-based motion during the December hearings but actually adduced on December 16, 2009, the day before Williams and the others were indicted.

On page 53 thereof, at line 14, the following exchange was had between Stuck and a Grand Juror:

GRAND JUROR:  So [Haddock] really did this on his own?  He wasn't coerced or anything[?]  He just thought this was the way to do it?

STUCK:  He is, 100 percent.  I've dealt with him.  I'd basically consider what you see as charged by Mr. Haddock, yes, he did it on his own, because he believes that this group, the propensity of violence and what things they're involved in, what they're doing is wrong with the drugs and the crime and the things they are doing.

Next, on page 95 of the record of the August hearings, Stuck again testified to Haddock's motivation:  "Mr. Haddock said it was the right thing to do.  He believed that if he didn't do this that Mr. Williams would move on… to somebody else and try to get somebody else that would assist him in his criminal enterprise."  Agent Nellis, for his part, testified in August Haddock did what he did because Haddock "believed… Mr. Williams and the conspiracy needed to be stopped."  (188:20-25)  Neither of these two law enforcement officers, who testified before Haddock did at those hearings, breathed a word about Haddock helping Conway when asked about Haddock's motivations.

Then came Haddock's turn in August, when he voluntarily reminded the government's lawyer examining him he asked law enforcement that "whatever [he] did be credited to Conway.  I was not told it would be or it wouldn't be.  I just said, you know, 'I hope that Mr. Conway receives the benefit of my cooperation.'"  (450:6-9)  This testimony apparently refreshed

35

Stuck's recollection, given he then testified in December Haddock did so state, but not until the summer of 2009, after the DCC recordings began in earnest.  (948:13-951:1)  Conway, for his part, testified he knew all along, from and after April 22, 2009, that Haddock was recording Williams for his benefit.  (1359:17-1360:11)   As Williams noted on Gov. Ex. 23 and in previous personal filings herein, he wishes he could be appointed a lawyer like Haddock.

Haddock, notwithstanding his relationship with Williams, also labored under obvious conflicts of interests in his concurrent representations of Conway and Muchegwa, and worked for the government during the time the government knew of these conflicts.  (1529:25-1533:7)  Having found the felon Conway's gun under Muchegwa's bed, Haddock turned it in to law enforcement, who had been informed the gun belonged to Conway.  (1495:1-1496:19)  Haddock then agreed to represent Conway without telling Conway he turned in his gun until a month later, making Haddock an obvious witness against Conway in the matter.  (372:6-21)  Conway did not enter into a plea agreement with the government until months after that.  (Case No. 8:08CR380, Filing 83)  Similarly, Muchegwa was not out of the woods because her Target parking lot complaint had been dismissed without prejudice (8:08MJ185, Filing 33), making Conway a potential witness against her.  No written waivers of these fundamental conflicts were executed by either Muchegwa or Conway, and the government, apparently

36

sensing some advantage could flow from the situation, simply played along.
(1531:15-1532:22)

Williams submits the totality of Haddock guts the government's
defense to the claims raised in Williams' motion.  His word is no good, yet
the government must rely on what he claims to remember from January,
2009, to get its case against Williams to trial.  And even if Haddock wasn't
such a liar, the government still has offered no excuse for using Haddock in
the way the record demonstrates, no reason why it couldn't get Williams the
same way it indicts so many other marijuana salespeople.  They had Conway
in the beginning, after all.  But while the government's chosen path, electing
to take advantage of and exploit the windfall Haddock presented, was
certainly the easiest one to follow to secure a big indictment, the questions
which must be answered before the Court can permit them to see where
that trail leads are as solemn as they come.

**VI.  Three of Those Questions.**

1.  Will the judiciary permit the government to use undercover
lawyers, who employ the fact that they are lawyers as their cover, to trick
citizens into incriminating themselves in the presence of the undercover
lawyer, and then bring the lawyer right into court to testify against the
citizens?

Williams hopes not, and it hasn't so far.  But that is exactly what the
government is proposing.  There is a lot of evidence in this record

demonstrating Haddock referred to Williams as his client and himself as
Williams' attorney during their meetings at DCC.  (See, Appendix)  During
the hearings, Haddock even specifically admitted at least once on cross-
examination he was actually acting as Williams' lawyer.  (1728:6-1729:5)
There is also evidence in the record of law enforcement's specific
instructions to Haddock not to correct Williams when Williams expresses his
belief that Haddock is his lawyer, so as not to raise Williams' suspicions or
tip him off and to otherwise keep the cover going.  Then there are the
several instances where Haddock is supplying Williams with legal advice
about his supervised release violation matter.  Why in the world would
Haddock do that?  To avoid raising Williams' suspicions and to keep the
cover going, of course.

That is really the point, here.  In order for any of this to work, the
government needed a lawyer who was willing to lie in his capacity as a
lawyer.  The government needed a lawyer who would agree "engage in
conduct involving dishonesty, fraud, deceit or misrepresentation."  *Neb. Ct.*
*R. of Prof. Cond.* §3-508.4(c).  If Haddock tells Williams the truth, that is if
he tells him on April 22 he is representing Conway and working against
Williams to gain Conway a sentence reduction, or if he tells Williams when
Williams repeatedly asks him to perform legitimate legal services why he will
not, the calls stop, the unlicensed flood of marijuana stops and so does the
damage to the integrity of the bar and the interests of the people it serves.

2.  Can the government induce, aid and abet a lawyer to violate the Rules of Professional Conduct and use the ill-gotten gains to prove a marijuana case?

Not this many Rules, surely:

*Neb. Ct. R. of Prof. Cond.* §3-501.1: A lawyer shall provide competent representation to a client;

*Neb. Ct. R. of Prof. Cond.* §3-501.4 (a)(5): A lawyer shall consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law;

*Neb. Ct. R. of Prof. Cond.* §3-501.4 (b): A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation;

*Neb. Ct. R. of Prof. Cond.* §3-501.5: A lawyer shall not collect an unreasonable fee from a client;

*Neb. Ct. R. of Prof. Cond.* §3-501.6(a): A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent;

*Neb. Ct. R. of Prof. Cond.* §3-501.7(a): A lawyer shall not represent a client if the representation involves a concurrent conflict of interest;

*Neb. Ct. R. of Prof. Cond.* §3-501.8(b): A lawyer shall not use information relating to the representation of a client to the disadvantage of the client unless the client gives informed consent;

*Neb. Ct. R. of Prof. Cond.* §3-501.8(j): A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client/lawyer relationship commenced;

*Neb. Ct. R. of Prof. Cond.* §3-501.9: A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

*Neb. Ct. R. of Prof. Cond.* §3-501.16(a)(1): A lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if the representation will result in violation of the Rules of Professional Conduct or other law;

*Neb. Ct. R. of Prof. Cond.* §3-501.16(a)(2): A lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client;

*Neb. Ct. R. of Prof. Cond.* §3-501.18(b): A lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation;

*Neb. Ct. R. of Prof. Cond.* §3-501.18(c): A lawyer subject to §3-501.18(b) shall not represent a client with interests materially adverse to those of a prospective client in the same or substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter;

*Neb. Ct. R. of Prof. Cond.* §3-502.1: A lawyer shall exercise independent professional judgment and render candid advice to a client.

*Neb. Ct. R. of Prof. Cond.* §3-504.1(a):  In the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.

*Neb. Ct. R. of Prof. Cond.* §3-504.2: A lawyer representing a client shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer without the other lawyer's consent;

*Neb. Ct. R. of Prof. Cond*. §3-504.3: In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than advice to secure counsel, if the lawyer knows or

reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of a client;

*Neb. Ct. R. of Prof. Cond.* §3-507.1: A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services;

*Neb. Ct. R. of Prof. Cond.* §3-508.4 (a), (c) and (d): It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct and/or to engage in conduct involving dishonesty, fraud deceit or misrepresentation and/or engage in conduct prejudicial to the administration of justice.

Even accounting for the government's argument, suffering as noted from its dependence on Haddock, that Williams was never Haddock's client and therefore most of these Rules do not apply, a few of them, including the one about lawyers in the course of their representation of a client not lying to third parties (*Neb. Ct. R. of Prof. Cond.* §3-504.1(a)) certainly do under any reading of the evidence.

There is also *Neb. Ct. R. of Prof. Cond.* §3-507.1, the Rule requiring lawyers to be truthful about themselves and their services.  Haddock made many misleading statements to Williams about both himself and his services, all with the government's blessing, with the single intent to gain incriminating evidence from him.

*Neb. Ct. R. of Prof. Cond.* §3-504.2 "contributes to the proper functioning of the legal system by protecting a person who has chosen to be

42

represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter." (comment [1])  Haddock never asked let alone received permission from Whitner prior to April 22 when he went to meet with Williams the first time, and the first thing Haddock asked Williams concerned the status of the matter for which Whitner was representing Williams.

And last but certainly not least, *Neb. Ct. R. of Prof. Cond.* §3-508.4 (a) and (c), which prohibits conduct involving dishonesty, fraud and deceit and the aiding and abetting of the same.  Haddock and the government's conduct fits squarely here at a minimum due to the lies Haddock told Williams about his relationship with Conway and securing Williams' nephew's release from jail.

While Williams argues for dismissal of the superseding indictment altogether, suppression of evidence is specifically recognized as an appropriate, independent remedy for government-sponsored ethical misconduct of this nature.  *United States vs. Sabri*, 973 F.Supp. 134, 146 (W.D.N.Y. 1996). See, also, *United States vs. Hammad*, 858 F.2d 834 (2nd Cir. 1988).  But Williams also knows, as the government told Haddock, if not for the evidence Haddock gained from Williams at DCC, the government had no case against Williams except for a "parole violation" which would only keep him in jail for a few months.  (Def. Ex. 139, pg. 4)

43

3.  And then a final question:  If Williams' indictment is permitted to stand, what will happen to the attorney/client relationship?

Williams' short answer is that it will be unnecessarily damaged and notes the government does not appear to care.  (1042:11-1043:25) (1048:24-1049:18)

**VII.  Applicable Law.**

"Prohibiting the government from using, as informants, attorneys who have an on-going attorney-client relationship with the suspects of a criminal investigation will not impede the investigatory process in any real manner. Indeed the lack of any case with similar factual circumstances may be indicative of just how foreign such manipulation of the attorney-client relationship is to the generally accepted principles of criminal justice in this country." *United States vs. Sabri*, 973 F.Supp. 134, 146 (W.D.N.Y. 1996). This wise counsel summarizes Williams' position in part, but somewhat begs the question:  When is someone your lawyer?

Williams submits someone is your lawyer when you pay them a special retainer, as Williams did to Haddock in the middle of January, 2009. A special retainer occurs where the "client agrees to the attorney a specified fee in exchange for specified services to be rendered" and "the fee may be calculated on an hourly, percentage or other basis and may be payable in advance or as billed." *United States vs. Parker*, 439 F.3d 81 (2nd Cir. 2006). Williams' $5,000.00 payment was just such a retainer, as it obviously was

44

made by Williams to access Haddock's services to, among other matters, challenge the crack laws and to get him and other African-Americans imprisoned under those laws out of jail.  When Williams was arrested in Arizona shortly after the retainer was paid, Haddock is the one who was contacted.  When Haddock performed his "research" in May, Williams is the one he brought it to, and when Williams was dissatisfied with the work, Haddock promised to do better and report his progress later to Williams. Williams even made his own use of the work he paid Haddock to perform by filing the August 4, 2009, habeas petition.  These are not random, unrelated events.  Williams gives Haddock money, Haddock gives Williams legal services.  Their professional relationship is readily apparent.

Williams finds additional evidence of this professional relationship throughout the DCC tapes, particularly those depicting instances where Haddock is giving him legal advice in response to Williams' specific request, and of course, Haddock's untaped but admitted responses to Williams' questions about Belize extradition law. Leaving aside the special retainer, *Westinghouse Electric Corp. vs. Kerr-McGee Corp.*, 580 F. 2d 1311 (7th Cir. 1978), an oft-cited case on this issue, holds the professional relationship "hinges upon the client's belief that he is consulting a lawyer in that capacity and has manifested [an] intention to seek professional advice." *Id.* at 1419. There is abundant audiotape evidence in this matter demonstrating Williams believed he was doing exactly that.

Williams now reiterates his claims made in his dismissal motion and suggests to the Court the relief he seeks is within the power of the Court to bestow.

A defendant's remedy for government misconduct in the pre-indictment stage of a criminal investigation is provided in the due process protections of the Fifth Amendment. *United States vs. Marshank*, 777 F.Supp. 1507, 1519 (N.D.Cal. 1991). See, also, *United States vs. Sabri*, supra, at 146-47; *United States vs. Henderson-Durand*, 985 F.2d 970, 973 n. 4 (8th Cir. 1993) (recognizing claim); *United States vs. Nieman*, 520 F.3d 834, 838 (8th Cir. 2008) (conduct of law enforcement can be so outrageous due process bars prosecution); *United States vs. Russell*, 411 U.S. 423, 431-32 (1973). A Fifth Amendment claim of this nature, so long as the grounds are apparent, must be raised in a pretrial motion or it is waived. *United States vs. Henderson-Durand*, supra, at 973-74.

The *Marshank* case, a "shocking tale of a criminal defense attorney who was oblivious to the professional norms of ethical behavior and a cast of overzealous government agents and prosecutors who facilitated the attorney's unethical conduct in an attempt to catch 'a big fish,'" bears striking factual similarities to the facts to be adduced in Williams' case. The district court ordered the dismissal of the indictment against Marshank on several grounds, including the Fifth Amendment grounds urged by Williams in his motion.

Relief from due process violations of the kind Williams proved at the hearings can include dismissal of the indictment, see, *Henderson-Durand*, 985 F.2d at 974 n. 4, or suppression of evidence obtained by way of the due process deprivation if it can be identified and isolated, see, *Marshank*, 777 F.Supp. at 1522. If the fruit of the violation is the indictment itself, dismissal is required. *Id.*  Williams contends his indictment is such a fruit. In the alternative, Williams argues all the evidence obtained by the government after January, 2009, the latest time the evidence shows Williams' legitimate attorney/client relationship with Haddock was formed, should be suppressed. This includes, of course, live witness testimony, the admissibility of which should be judged in accordance with considerations identified in *United States vs. Ceccolini*, 435 U.S. 268 (1978), at a separate hearing.  See, also, *United States vs. Wipf*, 397 F.3d 677, 684 (8th Cir. 2005) (*Ceccolini* requires consideration of (1) the stated willingness of the witness to testify, (2) the role played by the illegally seized evidence in gaining the witness's cooperation, (3) the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial, and (4) the police motivation in engaging in the illegal conduct.)

Williams desires to preserve his Sixth Amendment claim that his right to counsel attached in connection with the instant indictment, although he did not make his initial appearance before a magistrate in connection with it until December 21, 2009, when criminal proceedings were commenced

47

against him in Maricopa County, Arizona alleging he possessed marijuana for sale on or about January 16, 2009. Williams' arrest in that matter should be viewed, under *Blockburger vs. United States*, 284 U.S. 289 (1932), as for the same offense alleged in Count I of the instant indictment. If it is, Williams concludes *Texas vs. Cobb*, 532 U.S. 162 (2001), directs the conclusion that Williams' Sixth Amendment right to counsel attached from and after January 21, 2009, when he was formally charged in Arizona.

The right to counsel is "indispensable to the fair administration of our adversarial system of criminal justice." *Maine vs. Moulton*, 474 U.S. 159, 168-69 (1985). "[G]overnment interference with a defendant's relationship with his attorney may render that attorney's assistance ineffective and thus violate the Sixth Amendment. *United States vs. Irwin*, 612 F.2d 1182, 1185 (9th. Cir. 1980). However, "[n]ot all interference with the attorney-client relationship renders counsel's assistance so ineffective as to violate a defendant's sixth amendment right to counsel." *Hall vs. State of Iowa*, 705 F.2d 283, 290 (8th Cir. 1983). "A pretrial confrontation of the accused by the [government] must be analyzed to determine 'whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.'" *Id.*

As with a Fifth Amendment violation, a violation of the Sixth Amendment requires a remedy tailored to the injury suffered. *Marshank*, 777 F.Supp. at 1525 (further citation omitted.) "[D]ismissal [of the indictment] is

appropriate where there is continuing prejudice from a constitutional violation that cannot be remedied by suppression of the evidence." *Id.* As alleged in his Motion, Williams contends dismissal of his indictment is appropriate because the indictment is the fruit of this constitutional violation. In the alternative, Williams maintains all the evidence obtained by the government after the filing of his Arizona charges should be suppressed.

Finally, Williams observes "guided by considerations of justice," *McNabb v. United States*, 318 U.S. 332, 341 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, *McNabb*, supra, at 340; *Rea v. United States*, 350 U.S. 214, 217 (1956); to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, *McNabb*, supra, at 345; *Elkins v. United States*, 364 U.S. 206, 222 (1960); and finally, as a remedy designed to deter illegal conduct, *United States v. Payner*, 447 U.S. 727, 735-36 (1980). *United States vs. Hasting*, 461 U.S. 499, 505 (1983).  As the court in *Sabri* explained, "[t]he use of the Court's supervisory power to dismiss an indictment is even more rare, and limited, than dismissal based on government conduct. [Footnote omitted.] It is settled, however, that supervisory power to dismiss an indictment, although extremely limited, does

exist. *United States vs. Williams*, 504 U.S. 36 (1992); *Bank of Nova Scotia vs. United States*, 487 U.S. 250 (1988); *United States vs. Brito*, 907 F.2d 392 (2nd Cir. 1990). To warrant dismissal, the government's conduct must not only be flagrant, but must also have prejudiced the defendant. *Bank of Nova Scotia*, 487 U.S. at 254." *Sabri*, 973 F.Supp at 148.

Sabri*, *supra*, speaking to the invocation of the court's supervisory powers to dismiss part of Sabri's indictment, notes the following, which has particular application to the case against Williams: "[T]he government's manipulation of the attorney-client relationship, even those relationships which relate to civil matters, may have profound implications upon the nature of the attorney-client relationship and the integrity of the judicial process. Although the government claims that no other means of investigating were available [citation omitted], such a claim is disingenuous. Law enforcement agencies have an array of investigation techniques at their disposal (phone taps, surveillance, etc...) which would have been more appropriate than enlisting the defendant's attorney to extract further evidence and tape conversations. *There is no need to add to the challenges of our criminal justice system, or to increase the public's distrust, by making it permissible for lawyers to act in concert with the government to investigate their own clients*." *Id.* at 148. [Emphasis added.]

Williams cannot say it better.

**VIII.  Conclusion.**

The superseding indictment in this matter should be dismissed or all the evidence gathered against Williams by the government from and after January, 2009, should be suppressed.

Respectfully submitted this 7th day of February, 2011.

SHANNON WILLIAMS, Defendant,

BY____/s/ Michael J. Tasset_____
       Michael J. Tasset, No. 20796
       His Attorney
       JOHNSON AND MOCK
       307 N. Oakland Ave.
       P.O. Box 62
       Oakland, Nebraska  68045
       (402) 685-5647

### CERTIFICATE OF SERVICE

I, Michael J. Tasset, hereby certify that on February 7, 2011, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent notification of such filing to Maria R. Moran, Assistant United States Attorney.

_____/s/  Michael J. Tasset_____
       Michael J. Tasset

# APPENDIX

**(Times are approximate but close due to apparent software timer limitations)**

1.   **April 22, 2009**
     **Gov. Ex. 1**

### 14:22:40 to 14:36:05

The first in-person meeting between Haddock and Williams and the first of the DCC recordings.  Their discussions during this excerpt are treated above.

### 15:09:30 to 15:11:50

Near the end of their meeting, Williams, in a show of loyalty and with the intent to help drum up some business for Haddock, is referring a potential excessive force civil case; Haddock tells Williams Haddock should make Williams his "associate."

2.   **May 12, 2009**
     **Def. Ex. 116**

### 15:40:50 to 15:41:25

This portion of the exhibit demonstrates Haddock is still representing Muchegwa on this date in connection with the effort to gain her favorable treatment from state prosecutors in Douglas, Sarpy and Lancaster Counties, and that Stuck is the point man for that operation.  The evidence from the hearings is less than clear as to what Muchegwa was doing to warrant these efforts by law enforcement on her behalf.

**16:20:20**

Here Williams is on the phone explaining to the other part he is with his attorney.  No correction supplied by Haddock.

**16:32:15 and 16:37:20**

Williams provides the "email address for [his] attorney" to a female so she may send him baby pictures.  In the second excerpt, Williams is asking for pictures to be sent immediately because his lawyer is leaving soon.  No protestations from Haddock.

**16:52:00 to 17:12:18**

Here is Haddock meeting in a different room with a potential client whom Williams referred.  Haddock tapes their discussion without telling him, gives the tape to the government which then supplied the same to Williams without redaction.

**17:16:52 and 17:25:25**

Williams tells parties to phone calls, without correction from Haddock, his lawyer is present with him.


**3.**   **May 18, 2009**
       **Def. Ex. 117**

**15:43:20 to 15:43:33**

This excerpt is representative of the many times Haddock called DCC

to arrange a meeting with Williams.  Generally during these times, when

speaking with DCC personnel, Haddock identifies Williams as his client as he

does in this instance.

**16:38:00 to 16:41:03**

On this segment, Williams, who had made a recent court appearance

on his supervised release violation case with Whitner, is pumped for

information about it by Haddock.  Haddock specifically asks Williams to relay

Whitner's thoughts about Williams' defense in the matter.

At 16:38:42, Haddock takes a call from his other phone and explained

to the unidentified caller, in front of Williams, that he is "with a client at the

jail" and that he would like to call back when finished.

**16:59:45 to 17:09:00**

Williams during this excerpt provides Haddock a detailed history of

one of his prior cases and then asks Haddock for his opinion on the matter.

Williams places a call prior to Haddock's response, but there is no indication

from Haddock he would decline to offer his opinion.

**17:19:45 to 17:25:45**

Here Haddock is asking Williams specifically about Laura Adler, a

woman related to the investigation.  Adler had been stopped by law

enforcement for a dubious traffic violation and thereafter indicted after

authorities found a large amount of marijuana in her vehicle.  Haddock

explains to Williams the advice Haddock and other lawyers give to persons in

Adler's predicament and tells Williams he read the decision on Adler's motion

to suppress.

### 17:29:30 to 17:31:09

Williams asks Haddock what he thinks of Adler's case; Haddock offers

his analysis of applicable law.

**4.      May 26, 2009**
         **Def. Ex. 118**

### 12:06:55 to 12:13:00 (Session 2)

Haddock supplies to Williams the background check he performed for

Williams using a service he accessed from his office.  The report bears the

name of Haddock's law firm on the front page and was offered in evidence

under seal as Def. Ex. 144.  It was not received.

### 12:19:25

Williams calls Laura Adler, telling her he tracked her down by "pulling

a lawyer move" and that he was sitting with his lawyer at the time of the

call.  Haddock says nothing.

### 12:42:50

Here Haddock is asking Williams specifically about the details of his

Arizona legal problems.

**12:47:40**

Williams again during a call references the presence of his attorney without complaint by Haddock.

5.   **June 1, 2009**
      **Gov. Ex. 3**

**16:24:10 to 16:50:09**

This excerpt contains Haddock's explanation to Williams of Haddock's understanding of what the money Williams paid him was for and is treated above.

**17:41:12 to 17:47:33**

Here Haddock leaves Williams with the reasonable impression Haddock will be going to the law library over the weekend to research a legal issue he and Williams discussed pertaining to Williams' supervised release matter.  Also, Haddock can be heard telling Williams, at 17:45:40, that Haddock never understood in January the $5,000.00 payment was for Williams' "friend."

6.   **June 26, 2009**
      **Def. Ex. 120**

**16:39:30 to 16:40:15**

Haddock lies to Williams concerning the status of his employment at his law firm; Williams places a call and refers to his lawyer being present.

**16:59:50 to 17:00:00**

Williams informs caller he will be in contact on "Monday or Tuesday, whenever [his] attorney come back."

**17:49:50 to 17:54:00**

Haddock and Williams discussing household remodeling project; Haddock explaining the implications of applicable building codes.

**7.    June 29, 2009**
       **Def. Ex. 121**

**16:09:25 to 16:10:26**

Williams is in administrative segregation at this point, making it difficult for him to meet with his attorney.  Haddock tells Williams:  "I'll see if I can get this turned around."  Williams then asks "What?"  Haddock's reply:  "You should be able to meet with your attorney other than in here."

**16:15:00 to 16:15:20**

Caller asks Williams:  "Did your lawyer come to see you?"  Williams answers in the affirmative.  Nothing from Haddock.

**8.    July 3, 2009**
       **Gov. Ex. 4**

**1:39:35 to 1:40:28 (Session 8 (otherwise misdated))**

Here Williams inquires of Haddock whether Haddock had delivered his paperwork.  Williams is then "glad" that Haddock is there because Williams wants Haddock's input about his supervised release violation case.  Haddock

obliges, telling Williams "they will have to prove it in a court of law" and "they can say whatever they want, it's going to be the judge who decides."

### 1:46:55 to 2:01:45

Here Haddock advises Williams of his understanding of revocable and irrevocable trusts as they relate to Williams' plan to acquire houses and plan for his estate, and discusses with Williams pros and cons of doing so.

### 2:07:09 to 2:10:47 (Session 8 (otherwise misdated))

Haddock listens and records as Williams is discussion the strategy for defending his supervised release violation with Lefler.

### 3:30:40 to 3:31:05

Haddock tells Williams Haddock will take a book with him on his trip to Belize to research law with respect to Williams' plans to acquire houses.

9. **July 7, 2009**
   **Def. Ex. 122**

### 17:25:00 to 17:26:00

Williams is speaking with Hernandez about a real estate transaction; Haddock makes sure Hernandez knows to ensure the purchase agreement contains contingencies so she may back out of the deal if she wants.

10. **July 17, 2009**
    **Def. Ex. 123**

### 10:44:32 to 10:44:45 (Session 1)

Another representative example of Haddock identifying himself as Williams' lawyer while checking in with DCC.

**11:33:12 to 11:33:22 (Session 1)**

This is another instance of Haddock taking a call in front of Williams and telling the caller he is with a client and would like to call back at a later time.

**11.    July 20, 2009
         Def. Ex. 124**

**17:45:10 to 17:47:08**

Haddock and Williams, discussing matters of spirituality, transition to the allegations against Williams in Arizona.  Williams inquires of Haddock: "Would you as an attorney recommend that I plead guilty if we have the FBI and the Maricopa County Sheriff's Department…"  Haddock interrupts, advising Williams "there's something missing, it appears to me.  There's something missing."  Williams goes on to ask Haddock whether Haddock would plead a client to a criminal offense where fingerprint evidence suggested the client was not guilty.  Haddock's reply:  "Well, I'm not a criminal attorney, but I don't think so."

**17:51:09 to 18:07:19**

Haddock sits through and records another detailed discussion between Williams and Lefler regarding Williams' pending charges.  Haddock never advises Lefler he is listening or recording.

**12.    July 23, 2009
         Def. Ex. 125**

**16:57:50 to 17:02:00**

Another reference by Williams to Haddock being his attorney without correction; Haddock advising Williams to obtain a safety deposit box in the name of a corporation.  Haddock explains his understanding of intestate succession, wills and right of survivorship.

**17:40:05 to 17:41:45**

Haddock offers his opinion to Williams on how to safely keep a will.

**13.  July 27, 2009**
      **Def. Ex. 103**

**17:18:48 to 17:20:46**

Williams and Haddock are discussing Williams' money.  Haddock chides Williams, telling him the problem is that Williams is in jail and cannot protect his money.  Williams' reply:  "Why do you think I need you to help me get out of here."

Haddock then advises Williams to put his money in Belize banks and proceeds to expound on his knowledge of the history of banking there.

**17:21:33 to 17:22:00**

Haddock advises caller, in the presence of Williams, that "this is Terry, I'm an attorney for Mr. Williams and he's using my phone" and "I'm at the jail."  Williams refers the Court to Haddock's December testimony explaining this excerpt: (1728:6-1729:5.)

**14.  July 29, 2009**
      **Def. Ex. 126**

### 16:24:25 to 16:25:29 (Session 2)

Haddock advising Williams regarding how to properly leverage real

estate.

### 16:56:00 to 16:58:00 (Session 2)

Haddock telling Williams of a fake conversation Haddock claimed to

have with Sgt. Scherer.  In so doing, Haddock refers to Williams as his

client.

### 17:20:35 to 17:20:47

This is whole thing is a joke to Haddock.

**15.    August 3, 2009**
**Def. Ex. 114**

### 16:06:35 to 16:10:45 (Session 2)

Haddock and Conway meeting prior to Haddock meeting with

Williams.  Conway knows Haddock is taping him.  At 16:10:30, Conway

seeks assurance from Haddock that Haddock will be present for his

sentencing so Conway may receive credit for Haddock's assistance to the

government.  Conway inquires whether a subpoena is necessary.

### 16:49:50 to 16:50:07 (Session 2)

Williams, speaking to a caller, is in need of a power of attorney.

Haddock confirms he can and will provide it.

### 17:57:15 to 17:58:45 (Session 2)

Haddock promises he will have the previously discussed will and

related papers finished by the next Wednesday.

**16.   August 6, 2009**
      **Def. Ex. 127**

### 10:19:56 to 10:20:05 (Session 1)

Here Haddock can be heard telling his handler the government's

lawyer told him it doesn't matter whether Williams keeps referring to

Haddock as his attorney.

**17.   August 11, 2009**
      **Def. Ex. 104**

### 16:04:50 to 16:05:20

Haddock expresses concern to law enforcement the investigatory

strategy against Williams amounts to entrapment.

**18.   August 18, 2009**
      **Def. Ex. 128**

### 18:07:20 to 18:08:22

Williams telling caller of a letter he sent through his lawyer and

explains that he is no longer in administrative confinement so he can meet

with his attorney in the same room.  Haddock is silent.

**19.   August 21, 2009**
      **Gov. Ex. 5**

### 16:21:00 to 16:31:07 (Session 1)

Williams and Haddock discussing the criminal case of Williams' friend.

Haddock yet again weighing in with his legal opinion of Williams' chances of

beating his supervised release problems, telling him (while reviewing a

motion filed for Williams) that it will be "impossible to lose."  Haddock then

informs Williams his lawyer, Lefler, "ain't that smart."  Finally, Haddock, while talking with Williams and Hernandez about winning the lottery, asks the pair "as your attorney do I get to pick up the check?"

**20.   September 4, 2009**
   **Def. Ex. 130**

### 18:03:00 to 18:04:08 (Session 3)

Williams is discussing the status of his supervised release case with a caller and Haddock.  Williams inquires specifically of Haddock whether, in the context of the running of the time to file an appeal, ten days means ten calendar days or ten working days.  Haddock's answer:  Ten calendar days.

**21.   September 23, 2009**
   **Def Ex. 107**

### 44:07 to 45:40

Haddock here is asking Williams how his supervised release proceedings are going and opines an adverse ruling Williams received is appealable.

### 1:43:48 to 1:45:48

After listening to and recording a long discussion between Williams and Lefler and sensing Williams' disappointment, Haddock explains to Williams that he has seen a lot of lawyers cave into judges.  Haddock, while discussing the case, tells Williams the government has got him.

**2:01:00 to 2:02:42**

Haddock goes on at this point to advise Williams that he would not need to appeal if he signs the plea agreement the government is supposedly offering him.

**22.  September 25, 2009
Def. Ex. 108**

**35:49 to 36:52**

Williams calls Lefler's office to tell him he is taking the five year deal. Haddock ensures Williams knows the deal is in writing and gives his blessing when Williams informs him it is.

**1:03:36 to 1:04:00**

Haddock here consoles Williams, advising that if the cooperation component of the five year deal comes through, Williams will get a downward departure and be out in a year.

**23.  May 18 to May 31, 2009
Def. Ex. 115**

**Track 1243785725__251; 1:47 to 6:14**

This track features Conway and Muchegwa discussing Conway's future Rule 35 proceeding.  The pair understand Conway is to receive credit for not only his cooperation, but also Muchegwa's.  Counting Haddock, Team Conway is up to four players, to include Stuck.

Also noteworthy are Conway's plaintive expressions concerning his desire to get out of jail.  On the tape, he seems prepared to do what needs to be done to make this happen.

**24.  June 4, 2009**
     **Def. Ex. 119**

**13:38:52 to 13:39:57**

Agent Nellis and Haddock mistakenly believe the recorder is turned off during this excerpt, permitting the listener to understand Haddock is being instructed by the FBI to interrogate Williams concerning Williams' and Whitner's supposed relationship with a federal district judge.  Haddock acknowledged the impetus behind this activity was nothing more than the word of Conway, but half-heartedly claimed Williams "hinted" at such a relationship on the tapes.  (1637:2-1638:17)  He in fact does not.  In further fact, the DCC tapes show beyond question this is a ludicrous allegation; every time Williams appears before this judge on his supervised release matter, his prospects keep getting much worse, not better.

SHANNON WILLIAMS, Defendant,


BY    /s/ Michael J. Tasset
         Michael J. Tasset, No. 20796
         His Attorney
         JOHNSON AND MOCK
         307 N. Oakland Ave.
         P.O. Box 62
         Oakland, Nebraska  68045
         (402) 685-5647

## CERTIFICATE OF SERVICE

I, Michael J. Tasset, hereby certify that on February 7, 2011, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which sent notification of such filing to Maria R. Moran, Assistant United States Attorney.


                                        /s/  Michael J. Tasset
                                        Michael J. Tasset