IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA, )
                       )
          Plaintiff, )           8:09CR457
                       )
          v. )
                       )
SHANNON WILLIAMS, )      MEMORANDUM AND ORDER
                       )
          Defendant. )
_____)

## I.  INTRODUCTION

This matter is before the Court on defendant Shannon Williams' and defendant Deshawn Hernandez' pretrial evidentiary motions.  Williams has filed two motions:  (1) a Motion to Dismiss Indictment or to Suppress Evidence and Statements (Filing No. 213); and (2) a Motion to Suppress Statements of Conway (Filing No. 215).  Hernandez has also filed two motions:  (1) a Motion to Suppress Evidence (Filing No. 210); and (2) a Motion to Dismiss Indictment (Filing No. 211).[1]  Contemporaneous with these motions, Williams filed two briefs (Filing Nos. 214 and 216) and Hernandez filed one brief (Filing No. 212).  The Government filed a brief in opposition to the Conway Motion (Filing No. 252) and a brief in opposition to the Haddock Motions (Filing No. 265).

Beginning on August 17, 2010, the Court, under the supervision of the magistrate judge, began to conduct a motion

_____

[1] Filing Nos. 210, 211, and 213 will collectively be referred to as the "Haddock Motions" and Filing No. 215 as the "Conway Motion."

hearing (Filing Nos. 462, 470, and 471).  The motion hearing

lasted until August 19th, when it was continued.  The motion

hearing then was transferred to the undersigned on September 24,

2010 (*See* Filing No. 514).  The hearing resumed briefly on

November 29th and 30th (Filing Nos. 636 and 637), and then was

continued to December 9, 2010, ultimately concluding on December

21st (Filing Nos. 640, 641, 642, 643, 644, 645, 646, 647, and

648).[2]

---

[2] Numerous delays have occurred.  At the request of Williams
and some of his co-defendants, the magistrate judge extended
three times, the deadline for pretrial motions from January 15,
2010, to April 16, 2010.  Williams and Hernandez filed their
pretrial motions on April 16th.  Williams' motions were filed by
his initial counsel in this case, Michael Tasset.  After the
motions were filed, Williams moved to have new counsel appointed,
which the magistrate granted on June 7, 2010, appointing Robert
Creager.  The motion hearing was then scheduled to begin on
August 3, 2010, but Williams moved to continue the hearing until
August 17, 2010, in order to allow Creager more time to prepare
for the motion hearing.  The motion hearing began on August 17th
and proceeded for three days, when the hearing was continued to
September 14, 2010 (*See* Filing No. 358).

On September 14th, the magistrate judge was not able to
resume the motion hearing because Williams moved to substitute
his appointed counsel, Creager, with his newly retained counsel,
Ray Richards (Filing No. 493).  The magistrate judge authorized
the substitution and ordered the motion hearing continued until
November 15, 2010, in order to allow Richards time to prepare.
This Court attempted to resume the hearing on November 15th, but
due to a conflict that arose between Williams and Richards,
Richards withdrew from the case.  The Court reappointed Tasset as
Williams' counsel on November 15th and granted another
continuance to November 29, 2010 (Filing No. 554).

After the hearing resumed on November 29th, Williams, on
November 30th, filed a Motion to Determine Competency (Filing No.
573).  After the Court determined Williams competent to stand
trial (Filing No. 602), the motion hearing resumed December 9th.

The Court granted leave for the parties to file post-hearing briefs. Both Hernandez and Williams filed briefs (Filing Nos. 665 and 667) reiterating their positions on the motions. The Government filed two briefs, one addressing the Conway Motion (Filing No. 693) and one addressing the Haddock Motions (Filing No. 694). Hernandez and Williams filed reply briefs (Filing Nos. 701 and 707). The Court has reviewed the motions, briefs, oral and documentary evidence, and the applicable law, and finds Williams' and Hernandez' motions should be denied.

## II.  FINDINGS OF FACT

This case begins with a routine traffic stop in Illinois. On or about October 5, 2008, Steve Kisseberth was driving a U-Haul truck westbound through Illinois when he was pulled over by a local law enforcement officer. A search of the truck resulted in law enforcement finding a large quantity of marijuana in the truck. Upon arrest Kisseberth identified Omaha, Nebraska, as his intended destination for the marijuana. Kisseberth agreed to help law enforcement conduct a sting operation, in which Kisseberth would continue driving the marijuana to Omaha and deliver it to its intended recipients under law enforcement surveillance. While in custody, Kisseberth made phone calls to coordinate the marijuana's delivery to Shannon Williams and to Richard Conway, Williams' associate. Under law enforcement supervision, Kisseberth drove the marijuana

to Omaha and arrived at the agreed delivery point, a Target store in west Omaha. When Kisseberth arrived at the delivery point, Conway, Nyasha Muchegwa, and three other individuals were waiting. After Kisseberth delivered the marijuana, law enforcement officials arrested Kisseberth, Conway, Muchegwa, and two others.

Two days later, the arrestees made their initial appearances. Muchegwa was represented by attorney Terry Haddock. Haddock was a friend of Muchegwa and had represented her and her family on previous legal matters. Although Haddock's legal practice at the time was primarily civil and he had little criminal law experience, he agreed to meet with Muchegwa and discuss her arrest. Haddock proceeded to the Douglas County Correctional Center ("DCCC") and met with Muchegwa in one of the attorney-clergy rooms. When Haddock broached the topic of his legal fees, Muchegwa told Haddock to speak with Conway. Haddock then spoke with Conway, who told Haddock there was some money stashed in Muchegwa's home that could be used for her legal fees, which Haddock retrieved. On or about October 16, 2008, Haddock arranged for Muchegwa to participate in a proffer interview with the Government. On October 22, 2008, the Government moved to dismiss the complaint filed against Muchegwa (*See United States v. Muchegwa*, No. 8:08MJ185, Filing No. 33).

At his initial appearance, Conway was represented by attorney Eric Whitner.[3]  Whitner had previously become Conway's attorney during the summer of 2008, when Shannon Williams introduced Whitner to Conway in connection with another criminal matter pending against Conway.  Whitner also represented Williams at that time.  The Government filed an indictment against Conway on October 22, 2008. (*United States v. Conway*, No. 8:08CR380, Filing No. 28).  On October 16, 2008, prior to being indicted, Conway agreed to submit to a proffer interview with the Government with Whitner present.  Before the proffer interview began and outside the presence of Whitner, Conway expressed to a law enforcement officer that he desired to assist law enforcement, but that he did not want to provide any information in front of Whitner.  Conway feared providing information in Whitner's presence because Whitner would likely tell Williams of Conway's cooperation.  Conway testified he did not speak truthfully at the October 16th proffer interview because of this fear.

After Conway's proffer interview, Conway and Haddock met at DCCC to discuss the topic of Muchegwa's legal fees. During this meeting, Conway and Haddock began talking about the pending charges filed against Conway.  Haddock encouraged Conway to cooperate with law enforcement.  Subsequently, Conway agreed

---

[3] Whitner died in August 2009.

to wear a recording device during his next meeting with Whitner. It was believed that Whitner had some involvement in the alleged drug conspiracy for which Conway was indicted, and it was hoped that Whitner would disclose some incriminating information while meeting with Conway. Sergeant Daniel Scherer, an officer at DCCC, placed a recording device on Conway's body on October 29, 2008, allowing Conway to record his conversation with Whitner. Although Conway successfully recorded his meeting with Whitner, he was unable to obtain any incriminating information during the meeting. After the meeting, law enforcement asked Conway to record further meetings with Whitner, but Conway refused because he believed Whitner was suspicious of him.

Conway agreed to submit to another proffer interview with the Government on November 5, 2008, and requested Haddock be present instead of Whitner. Conway gave information at this proffer interview regarding Shannon Williams and an alleged conspiracy by Williams to import marijuana into the Omaha area. Law enforcement was interested in Williams not only for the alleged drug conspiracy, but also because Williams was subject to an outstanding arrest warrant for a supervised release violation (*See United States v. Williams*, No. 8:93CR27, Filing Nos. 618 and 619). After violating his conditions of supervised release, Williams had evaded arrest. After Conway's second proffer interview, Whitner notified Conway that he was withdrawing as

Conway's attorney and arranged for another attorney to represent Conway.[4]

Throughout all of these events, Conway was in contact with Williams. Until he withdrew, Whitner brought a cellular telephone into DCCC for Conway to use to contact Williams. Because of Whitner's status as an attorney, Whitner was able to smuggle a phone to Conway in DCCC, allowing Conway to communicate unmonitored with Williams. When Whitner withdrew from Conway's case, Haddock provided the same service, putting Conway and Williams in contact via a phone Haddock brought with him to DCCC. Prior to this, Haddock had never been in contact with Williams. With Haddock's assistance, Conway began disclosing information about Williams to Detective John Stuck of the Bellevue Police Department. Det. Stuck was aware that Haddock was bringing a phone into DCCC and condoned the practice, as it facilitated contact with Williams. From Conway's conversations with Williams, it was learned that Williams was located in Arizona.

Starting in late November or early December of 2008, Williams began contacting Haddock directly. During one of these conversations, Williams indicated he intended to kill two

---

[4] Attorney Michael Gooch filed a notice of appearance as co-counsel for Conway on November 13, 2008 (*United States v. Conway*, Case No. 8:08CR380, Filing No. 43). Whitner formally withdrew from Conway's case on January 26, 2009 (*Id.*, Filing No. 50). Another attorney, Stuart Dornan, filed a notice of appearance to represent Conway on February 3, 2009 (*Id.*, Filing No. 54).

witnesses in Conway's case, Steve Kisseberth and Daniel Bouquet, in order to help Conway's defense.  Haddock informed Det. Stuck of Williams' witness-elimination threat.

On January 12, 2009, in connection with the services Haddock had provided for Conway, Williams arranged for an associate of his, James Hatten, to deliver $10,000.00 to Haddock. Hatten delivered the money to Haddock in the parking lot in front of Haddock's law office, and Haddock issued a receipt of funds to Hatten (Government Exhibit 20).  The receipt stated the money was received from "SW/JH for Richard 'Rick' Conway."  Haddock testified that Williams told him the money was for Conway's legal fees.

The next day, January 13, 2009, Haddock received $5,000.00 from another Williams' associate, Fred Lewis.  During a previous conversation, Haddock and Williams had discussed a friend of Williams who had been imprisoned for a crack cocaine drug conviction.  Haddock told Williams that Haddock had written a paper as an undergraduate regarding the disparity in crack cocaine and powder cocaine sentencing and that he would conduct some research on the topic for Williams' friend.  When Lewis delivered the money, he said to Haddock:  "I hear you're helping our friend."  Haddock testified he interpreted "our friend" to mean a friend of Lewis and Williams.  After Haddock received the money, Williams called to confirm its receipt and told Haddock

the money was for a friend's case.  At the time of this
conversation, the friend's identity was not disclosed to Haddock.
Det. Stuck testified that he was aware of both the $10,000- and
the $5,000-payments Williams made to Haddock and that he believed
the money was for services Haddock was rendering for Conway and
for Williams' friend.

On January 16, 2009, Williams was arrested in Arizona,
under the alias Donald Jarmon, for possessing approximately 400
pounds of marijuana.  Word of Williams' arrest reached Nebraska
when someone purporting to be Williams' son called Haddock and
told him of Williams' arrest.  Haddock gave this information to
Det. Stuck.  However, before law enforcement in Nebraska could
prevent Williams' release from custody in Arizona, Williams'
associate, Vicki Cass, posted bail for Jarmon/Williams on January
20, 2009 (Government Exhibit 19).  With his release from custody
in Arizona, Williams again evaded detection by law enforcement.

After Williams fled Arizona, he remained in periodic
contact with Haddock.  Haddock continued to pass information
about Williams' location to law enforcement.  On February 19,
2009, Williams was arrested in Minnesota, and plans were made to
transfer Williams back to Nebraska (*United States v. Williams*,
No. 8:93CR27, Filing No. 624).

With Williams about to return to Nebraska in custody,
Det. Stuck and Haddock began discussing ways to obtain more

incriminating information about Williams' involvement in the drug-importation conspiracy.  Haddock informed Det. Stuck that Conway was willing to be housed in the same jail cell at DCCC as Williams and wear a recording device.  The Government made no promises or threats to Conway for his cooperation in recording Williams.  FBI Special Agent ("S.A.") G. William Nellis requested authorization from the Justice Department to place a recording device on Conway, which was given on March 30, 2009.  Det. Stuck informed Sgt. Scherer, Lieutenant Matthew Wheeler, and Deputy Director Mark Foxall (all DCCC employees) of the plan and coordinated the administrative process for having Conway and Williams assigned to the same jail cell.

Williams arrived back in Nebraska under custody on April 1, 2009, and was placed in confinement at DCCC in the same jail cell as Conway, located in the "E-mod."  The E-mod housed approximately forty inmates who resided in two-person jail cells. No other inmate resided in Williams' and Conway's jail cell. Located in the E-mod were several individuals acquainted with Conway and/or Williams.  Conway testified he had no authority over any of these individuals, neither he nor any of these individuals threatened or intimidated Williams, and many of the individuals admired Williams.

With Williams and Conway housed together, S.A. Nellis supplied Conway with the recording device.  Conway was able to

record one session with Williams, which lasted about five hours and forty-five minutes (Government Exhibit 12).  The majority of the recording took place in Williams' and Conway's cell with no one else present.  Williams made incriminating statements to Conway, which were recorded.  Conway returned the recording device to law enforcement, but refused to make another recording because he feared Williams was suspicious about the circumstances leading to their placement in the same cell.

Williams continued in early April to be represented by Whitner.  For a time, Whitner met with Williams at DCCC and provided Williams with a cellular telephone to use so that Williams could make unmonitored calls.  At some point, Williams began to distrust Whitner and wanted to make different arrangements for accessing a phone.  Williams asked Conway to inform Haddock that Williams wanted Haddock to start bringing a phone into DCCC for Williams to use.  Williams told Conway that he would pay Haddock $1000 per month in exchange for Haddock providing this service.  After Conway conveyed the message to Haddock on April 13, 2009, Haddock contacted Detective David Bruck[5] with the Omaha Police Department.

---

[5] Det. Bruck was serving at the time as Haddock's contact with law enforcement while Det. Stuck was out of town.  On August 26, 2010, Det. Bruck was involved in a work-related accident that rendered him unavailable to testify at the motion hearing.

Law enforcement knew Whitner was providing a phone to Williams and believed Williams was coordinating criminal activity through use of Whitner's phone. With word of Williams' request to have Haddock provide Williams with a phone, a plan was devised to record Williams' conversations in hope of obtaining more information about Williams' drug conspiracy. S.A. Nellis requested authorization from the Justice Department to have Haddock bring a recording device into DCCC to record Williams, which authorization was given on April 20, 2009. Det. Stuck also informed the DCCC administrators of the plan to have Haddock record Williams.

Haddock had conversations about whether to go through with the plan with Det. Bruck and Assistant United States Attorney ("AUSA") Maria Moran. In explaining why he agreed to record Williams' conversations, Haddock testified he was motivated by Williams' previous threats to Kisseberth and Bouquet (the potential witnesses against Conway), by his fear of Williams being released from custody, and by Williams' role in introducing drugs into the community. The Government made no promises to Haddock prior to his agreement to record Williams. Haddock did hope his cooperation would help Conway, but the Government made no promises to him in this regard.

Det. Stuck and S.A. Nellis testified law enforcement had no reason to believe and did not believe at any time that

Haddock was Williams' attorney. Haddock discussed with Det. Stuck, S.A. Nellis, and AUSA Moran the need for Haddock to be very careful so that his actions could not be interpreted to have formed an attorney-client relationship. Prior to the first recording, Haddock specifically discussed with S.A. Nellis the need to tell Williams at the start of their conversation that Haddock was not Williams' attorney and would not represent him.

On April 22, 2009, Haddock made his first trip to DCCC to meet Williams. In total, Haddock had sixty-three meetings with Williams between April and December of 2009. A typical meeting between Haddock and Williams could last two to three hours. In the recordings, Williams can be heard discussing numerous topics with myriad individuals. Many of the conversations centered on a conspiracy to import marijuana to the Omaha area and to launder money. Ongoing or future criminal activity was discussed at some point during each of Haddock's meetings with Williams. Given the recordings' vastness, the Court will not attempt to summarize their full content here, but rather will focus only on the excerpts most relevant to the issues in the motions.

**April 22, 2009 - Government Exhibit 1**

       This is Williams' and Haddock's first meeting.  About two minutes into the meeting, Haddock informs Williams of his concerns of providing a phone to Williams.  Haddock expresses that he could lose his license or get in trouble for providing a phone to Williams.  Haddock also tells Williams that he does not know what types of calls Williams is going to make and asks whether Williams is going to be running "his empire" with the phone.  The two have the following exchange:

> **Haddock:** I just want you to know, as of now, I am not your attorney.
>
> **Williams:** Yeah, you're interviewing a potential client.
>
> **Haddock:** Well, I'm here just to facilitate you.
>
> **Williams:** Alright, well you're interviewing a potential client, can't you do that? You can't, I'm on a civil matter.
>
> **Haddock:** Okay, tell you what, I don't want to get cross with you, like I said there are two ways I could lose my license, [Whitner]'s already pissed at me okay? . . .
>
> **Williams:** You don't have to worry about [Whitner] doing nothing.
>
> **Haddock:** Okay, right now, just I'm not your attorney.
>
> **Williams:** Okay. But to cover your ass . . .
>
> . . .
>
> **Haddock:** . . . I have nothing to do with being your attorney, okay, I don't want it civil or anything because the problem I have is

> **Williams:** [Interrupting] But what, what would you say that you came to see for, I can't say hey I asked this guy.
>
> **Haddock:** Don't worry about it, they don't know.
>
> **Williams:** Alright.
>
> **Haddock:** They don't upstairs know, but I'm just saying if [Whitner] ever
>
> **Williams:** [Interrupting] It's not [Whitner]'s business.
>
> **Haddock:** I don't want you to be able to say, write a letter to the bar saying, he's not my attorney, he's just coming up to see me, and he could do it because he was an attorney (laughs), so that's what the deal is, I could do it because I'm an attorney.
>
> **Williams:** I mean, that is what I'm saying, like if it ever came up, [Haddock], just cross your i's and dot your t's . . .

(Government Exhibit 1 at 14:27:30 to 14:29:50). Later during the meeting, Williams initiates a call with an associate of his, Gerald Williams ("Gerald"):

> **Williams:** I finally got this guy down here to see me so I am able to call you . . . I got a new attorney man . . .
>
> **Haddock:** I am not your attorney.
>
> **Gerald:** You got a new attorney?
>
> **Williams:** No just a new friend.

(*Id.* at 14:48:36).

## April 23, 2009 - Government Exhibit 2

The following day, Haddock returns to DCCC to meet with Williams. During a conversation with Gerald, Williams says in

reference to Haddock: "He's not [Conway]'s lawyer, [Haddock] does not represent us, he is just a friend, he is a lawyer who is a friend" (Government Exhibit 2 at 14:19:52).

**May 12, 2009 - Defendant's Exhibit 116**

At this meeting, during telephone conversations with third parties, Williams references Haddock as his attorney and Haddock does not correct Williams (Defendant's Exhibit 116 at 16:20:20, 16:32:15 to 16:37:20, 17:16:52 to 17:25:25).[6] At the motion hearing, Haddock testified that he had discussions with law enforcement officials regarding Williams' repeated references to Haddock as his attorney. Haddock had corrected Williams on several occasions when Williams referred to Haddock as his attorney. However, Haddock asked for guidance on whether he needed to correct Williams every time Williams referred to Haddock as his attorney. Ultimately, law enforcement decided Haddock did not need to correct every reference Williams made regarding Haddock being his attorney. Law enforcement believed

---

[6] There are other instances in the sixty-three meetings where Williams referred to Haddock as his attorney, but Haddock did not correct Williams (*See* Defendant's Exhibit 118 at 12:19:25, 12:47:40 (May 26th); Defendant's Exhibit 120 16:39:30, 16:59:50 (June 26th); Defendant's Exhibit 121 at 16:14:55 (June 29, 2009); Defendant's Exhibit 125 at 16:57:50 (July 23rd); Defendant's Exhibit 128 at 16:04:50 (August 18th)). Haddock also on isolated occasions referred to Williams as his client (*See* Defendant's Exhibit 117 at 16:38:00 (May 18th); Defendant's Exhibit 121 at 16:10:20 (June 29th); Defendant's Exhibit 123 at 11:33:12 (July 17th); Defendant's Exhibit 103 at 17:21:30 (July 27th)).

Williams' references to Haddock being his attorney was a code
Williams used to alert the people he called that Williams was
calling from an unmonitored phone, allowing them to speak freely.

**May 18, 2009 - Defendant's Exhibit 117**

During this meeting, Williams briefly discusses with
Haddock a recent court appearance Williams made with Whitner in
connection with his supervised release violation case.  Haddock
asks two questions regarding the case's status (Defendant's
Exhibit 117 at 16:38:00 to 16:41:03).[7]

**June 1, 2009 - Government Exhibit 3**

During an extended excerpt, Williams and Haddock
discuss their understanding on the basis for the $5,000.00 paid
to Haddock by Fred Lewis on January 13, 2009, to conduct research
on the crack cocaine sentencing disparity issue (Government
Exhibit 3 at 16:24:10 to 16:50:09).  During the conversation,
Williams makes clear that the requested research was done on
behalf of another individual, Dion, who was imprisoned in
Wisconsin, and that Dion had paid the $5,000.00 to have Haddock

---

[7] Williams occasionally talked to Haddock regarding his
supervised release violation case (*See* Government Exhibit 4 at
1:39:34 (July 3rd); Defendant's Exhibit 124 at 17:46:00 (July
20th); Defendant's Exhibit 125 at 16:57:50 (July 23rd);
Government Exhibit 5 at 16:20:00 (August 21st); Defendant's
Exhibit 130 at 18:03:00 (September 4th); Defendant's Exhibit 107
at 44:07 (September 23rd); Defendant's Exhibit 108 at 35:49,
1:03:36 (September 25th)).  At all times, either Whitner or
attorney Steve Lefler represented Williams in connection with
Williams' supervised release violation case.

conduct the research (*Id.* at 16:38:30).  In recalling the
conversation with Fred Lewis from January 13th, Haddock states:
"[Lewis said] I hear you're . . . helping our friend.  And I said
yeah [pause] I thought our friend was you, okay.  And he said
'God bless you' and walked out."  Haddock testified he was not
referring to Williams when he said "you" and did not believe he
was doing legal work for Williams.

**June 26, 2009 - Defendant's Exhibit 120**

Toward the end of the meeting, Williams and Haddock
discuss a residential remodeling project that Williams was
coordinating (Defendant's Exhibit 120 at 17:49:50 to 17:54:00).
This remodeling discussion was made in connection with Williams'
plan to launder money earned from his alleged drug-importation
conspiracy.  The money laundering plan included setting up a
business entity, Mango Creek Properties, Inc. ("Mango Creek"), to
purchase and refurbish houses for resale and/or renting.
Williams coordinated the Mango Creek money laundering plan with
co-defendant Hernandez, among other people.  Williams also
enlisted Haddock in the Mango Creek money laundering plan.
Haddock, under the supervision of law enforcement, formed Mango
Creek and opened bank accounts in its name.  Williams directed
Haddock to deposit drug money into Mango Creek's bank accounts.
For this service, Williams paid Haddock $3,000.00 for every
$50,000.00 Haddock laundered.  Haddock performed these tasks for

Williams under the supervision of law enforcement officers and turned over to law enforcement any money he received for money laundering services.

In addition to Mango Creek, Williams and Hernandez laundered money through another business, E-Zone Investments, which Hernandez and Williams jointly owned. Haddock was not involved in E-Zone but believed Whitner had established it for Williams and Hernandez.

**July 29, 2009 - Defendant's Exhibit 126**

Haddock and Williams discuss, in connection with the Mango Creek money laundering plan, how to leverage real estate (Defendant's Exhibit 126 at 16:24:25 to 16:25:29). Later, Williams and Haddock discuss a conversation Haddock had the previous day with Sgt. Scherer. Haddock claimed Sgt. Scherer had confronted Haddock about the number of visits Haddock was making to DCCC to visit Williams and Conway (*Id.* at 16:56:00 to 16:58:00). In fact, Haddock's conversation with Sgt. Scherer never occurred. Haddock fabricated the conversation to attempt to stop Williams' repeated requests to Haddock to smuggle drugs and other contraband into DCCC. Haddock hoped the ruse would make Williams think that jail personnel were closely monitoring Haddock, thus preventing Haddock from smuggling the contraband items to Williams. In relating the false story to Williams, Haddock claimed he said to Sgt. Scherer: "I don't really

appreciate an officer when I'm in conversation with my client walking through the door without knocking."[8]  Haddock testified the reference to Williams as "my client" was made with the understanding between Haddock and Williams that Haddock was merely posing as Williams' attorney in order to be able to provide a phone to Williams.

**August 21, 2009 - Government Exhibit 5**

In response to a comment by Williams regarding how to use Haddock to his benefit, Haddock responds: "We are using my position to your benefit, I've made you a rich man in here." Toward the end of the meeting while discussing the Mango Creek money laundering plan, Haddock makes a comment to Williams: "You should be glad that I am not your attorney or I would be charging you by the hour."  Williams responds: "I could cover it" (*Id.* at 17:46:34).

**September 1, 2009 - Government Exhibit 7**

At this meeting, Williams calls Whitner's law office to inform him that his "attorney" will be stopping by to pick up a quit claim deed.  After the call ends, Haddock states to Williams: "You have to be careful about telling people I'm your attorney."  Williams inquires as to whether Haddock can represent

---

[8] On prior occasion and upon Det. Stuck's request, Sgt. Scherer did enter into the attorney-clergy room while Haddock and Williams were meeting and removed Haddock.  This was done to give the appearance to Williams that jail personnel were monitoring Haddock's activities.

him on civil matters, and Haddock responds that his license is in "limbo." Haddock also references a bar complaint filed against him with the bar association (Government Exhibit 7 at 16:33:00 to 16:40:00).[9]

**September 15, 2009 - Government Exhibit 8**

After Haddock once again rebuffs Williams' request to smuggle drugs into DCCC, Williams states to Haddock: "You're not even a lawyer right now" (Government Exhibit 8 at 18:13:40).

*    *    *

Beyond the meetings at DCCC, Haddock also performed tasks, under the supervision of law enforcement, in furtherance of Williams' alleged drug-importation conspiracy. Haddock received money from various conspiracy members to deposit into Mango Creek for the purpose of money laundering. Williams paid Haddock for these money laundering services in addition to the

---

[9] Haddock had, in fact, been the subject of a complaint filed with the Counsel for Discipline of the Nebraska Supreme Court ("Counsel") (Government Exhibit 17). On April 6, 2009, Haddock received a letter from the Counsel notifying him that a grievance had been filed against him. This grievance was filed with the Counsel in a matter unrelated to this case. With the grievance letter, Haddock devised a ruse in which he would tell Williams the bar association had placed him on probation and that he could not practice law. In support of the ruse, Haddock forged two letters, dated July 15, 2009, and August 4, 2009, on the Counsel's letterhead, indicating Haddock's license to practice law was under suspension. Haddock forged a signature at the bottom of both letters under an alias, Douglas U. Miles. Haddock did not receive permission from the Counsel to forge the letters. Haddock testified that he believed he informed Det. Stuck of the ruse prior to showing the letters to Williams and delivered the letters to Det. Stuck after Williams had seen them.

payments he made to Haddock for supplying Williams with a phone.

Williams also requested Haddock transport money for the

conspiracy to drug suppliers in Arizona. In early November,

Haddock transported $50,000.00 to Arizona for Williams. Williams

paid Haddock $3,000.00 for this service. Haddock transported the

money under the supervision of Det. Stuck and other law

enforcement officers. All money Haddock received from Williams

for his services was turned over to law enforcement.

On December 16, 2009, Williams, Hernandez, and nine

other individuals were indicted for possession with intent to

distribute 1,000 kilograms of marijuana, money laundering, and a

forfeiture count (Filing No. 1). A superseding indictment

(Filing No. 360) was filed on July 20, 2010, which reflected the

charges against the three remaining defendants in the case:

Williams, Hernandez, and Sara Jarrett.

## III. CONCLUSIONS OF LAW

### A. The Conway Motion

In the Conway Motion, Williams claims the recording

Conway made on April 1, 2009, should be suppressed because: (1)

Conway coerced Williams in violation of the Fourth Amendment into

making involuntarily incriminating statements; (2) the Government

obtained Williams' statements in violation of his Sixth Amendment

right to counsel; and (3) the Government's actions violated

Williams' right under the Fourth Amendment to be free from the unreasonable seizure of his person.

    1.    Coerced Statements - Fourth Amendment

       Williams claims his April 1, 2009, statements to Conway were involuntary because they were "'extracted by threats, violence, or express or implied promises sufficient to overbear [his] will and critically impair his capacity for self-determination.'"  *See United States v. Aguilar*, 384 F.3d 520, 523 (8th Cir. 2001) ("[W]hether the [interrogation] violated the Fourth Amendment . . . turns on the voluntariness of [defendant's] statements." (internal citations omitted)). Williams claims his statements should be suppressed under the Fourth Amendment.  The Government has conceded for the purposes of this motion that Conway was acting as the Government's agent.

       In determining whether Conway, in fact, coerced Williams' statements, the Court must weigh the voluntariness of Williams' statements based on the totality of the circumstances. *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc); *see also Arizona v. Fulminante*, 499 U.S. 279 (1991).  The Court looks at the conduct of the Government and the characteristics of the accused, by weighing factors such as:

> The youth of the accused . . . ;
> his lack of education . . . ; or
> his low intelligence . . . ; the
> lack of any advice to the accused
> of his constitutional rights . . .;
> the length of detention . . .;  the

repeated and prolonged nature of
the questioning . . .; and the use
of physical punishment such as
deprivation of food or sleep . . .

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal

citations omitted); *see also LeBrun*, 363 F.3d at 724.  The burden

of persuasion lies with the Government to prove by a

preponderance of the evidence the voluntariness of the challenged

statements.  *Aguilar*, 384 F.3d at 523.

Williams claims the totality of the circumstances

created an environment in which Williams was compelled to choose

between submitting to an interrogation by Conway or submitting to

a physical beating by Conway and/or his gang-affiliated

subordinates at DCCC.  Williams argued in his pre-hearing brief

that the evidence would demonstrate Williams had "no real choice

but to make statements to Conway" because Williams was placed in

a "dangerous environment" and had "to preserve his own safety"

(Filing No. 216, at 1).

No such evidence was provided at the hearing.  The

majority of the recorded conversations between Williams and

Conway took place in their jail cell.  Conway himself did not

intimidate Williams in the recordings or threaten Williams with

physical harm, and no one else was present during the recordings

to intimidate Williams.  Furthermore, there was no testimony at

the hearing demonstrating that Conway exercised supervisory

control over other inmates in the E-mod or that Conway offered to

protect Williams from other inmates in exchange for his statements. *Cf. Fulminante*, 499 U.S. at. 282-83. Rather, many of the other individuals housed in E-mod admired Williams. Upon reviewing the totality of the circumstances, there is no evidence or testimony in support of the notion that Williams' statements to Conway were involuntarily made due to coercion or intimidation in violation of the Fourth Amendment.

   2.   Right to Counsel - Sixth Amendment

      Williams further claims that his Sixth Amendment right to counsel had attached in connection with the instant indictment (which had not been filed on April 1, 2009) at the time he made incriminating statements to Conway, because Williams had previously appeared before a court in Arizona in connection with his January 16, 2009, arrest for possessing a large quantity of marijuana.[10] Pursuant to *Blockburger v. United States*, 284 U.S. 289 (1932), Williams claims that his arrest in the Arizona matter should be viewed as the same offense alleged in Count I of the instant indictment. If the January 16, 2009, arrest and the allegations in Count I of the indictment are viewed as the same offense, Williams claims his statements were obtained in violation of his right to counsel, and should therefore be suppressed pursuant to *Texas v. Cobb*, 532 U.S. 162 (2001).

---

[10] Williams alleges that he invoked his right to remain silent under the Fifth Amendment following his January 16, 2009, arrest.

> Although the Sixth Amendment right
> to counsel clearly attaches only to
> charged offenses, [the Supreme
> Court] has recognized in other
> contexts that the definition of an
> "offense" is not necessarily
> limited to the four corners of a
> charging document.  The test to
> determine whether there are two
> different offenses or only one is
> whether each provision requires
> proof of a fact which the other
> does not.

*Cobb*, 532 U.S. at 162.

Count I of the Indictment, which was filed on December 16, 2009, alleges Williams was involved in a conspiracy in Nebraska to possess and distribute marijuana.[11]  Williams' right to counsel for the December 2009 conspiracy charges could not have previously attached because a substantive crime and a conspiracy to commit that crime are not the same offense under *Blockburger*.  *United States v. Felix*, 503 U.S. 378, 389 (1992).  Therefore, no Sixth Amendment violation occurred.

C.   Unreasonable Seizure of Person - Fourth Amendment

Finally, Williams claims the Government forced him to either submit to his placement in the same cell with Conway at DCCC or be placed in administrative segregation, and such Government action violated Williams' right to be free from the unreasonable seizure of his person under the Fourth Amendment.

---

[11] The Superseding Indictment (Filing No. 360) is substantively identical to the original Indictment.

No evidence or testimony was provided at the hearing supporting this claim.

Williams' Motion to Suppress the statements of Conway will be denied.

**B.   The Haddock Motions**

Williams and Hernandez argue in the Haddock Motions that the superseding indictment filed against them must be dismissed because the Government's use of Haddock as an informant violated their rights under the Constitution.  Williams' and Hernandez' argument distilled is that the Government intruded into an attorney-client relationship established between Haddock and Williams and/or Hernandez, and this intrusion warrants dismissal.  Williams claims the Government's use of Haddock violated his rights under the Fifth and Sixth Amendments, and Hernandez claims her rights under the Fourth and Fifth Amendments were violated.  Alternatively, if dismissal is not appropriate, Williams and Hernandez request the Court suppress the evidence Haddock gathered against them for the Government.

1.   Outrageous Government Conduct - Fifth Amendment

a.   General Principles

Williams and Hernandez primarily argue the Government's use of Haddock constitutes outrageous government conduct.  The defense of outrageous government conduct has long been recognized as a defense potentially warranting dismissal of a criminal

charge.  *United States v. Russell*, 411 U.S. 423, 432 (1973);
*Rochin v. California*, 342 U.S. 165, 172 (1952); *United States v.
Morse*, 613 F.3d 787, 792 (8th Cir. 2010); *United States v. Hunt*,
171 F.3d 1192, 1195 (8th Cir. 1999).  A claim for outrageous
government conduct rests on the Fifth Amendment's Due Process
Clause.  *United States v. Searcy*, 233 F.3d 1096, 1101 n.3 (8th
Cir. 2000).  "The banner of outrageous [government] misconduct is
often raised but seldom saluted," *United States v. Santana*, 6
F.3d 1, 4 (1st Cir. 1993), and courts must necessarily exercise
scrupulous restraint before denouncing the conduct of law
enforcement as constitutionally unacceptable.  *United States v.
Jannotti*, 673 F.2d 578, 607 (3d Cir. 1982) (en banc).

        The Government's actions are the focus of an outrageous
government conduct defense.  *Hunt*, 171 F.3d at 1195.  The
Government's conduct must be "'so outrageous and shocking that it
exceeds the bounds of fundamental fairness.'"  *Hunt*, 171 F.3d at
1195 (quoting *United States v. Johnson*, 767 F.2d 1259, 1275 (8th
Cir. 1985)).  To prove a due process violation and to warrant
dismissal, the level of outrageousness of the Government's
conduct must be "quite high" and "must shock the conscience of
the court."  *United States v. Nieman*, 520 F.3d 834, 838 (8th Cir.
2008) (quoting *United States v. King*, 351 F.3d 859, 867 (8th Cir.
2003)(citing *Russell*, 411 U.S. at 431-32)); *see also Morse*, 613
F.3d at 792-93.

b.   The *Voigt* Test

The Eighth Circuit has not addressed the question of whether the Government's alleged intrusion into an attorney-client relationship constitutes outrageous government conduct, but other circuit courts have.  In *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), the Third Circuit developed a test for determining whether a defendant raised a successful defense for an alleged governmental intrusion into an attorney-client relationship.  In order to raise this defense, the defendant must prove: "(1) The government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice."  *Voigt*, 89 F.3d at 1067 (internal footnote omitted).  Other circuit courts have adopted the *Voigt* test in evaluating similar claims of outrageous government conduct.  *See United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008) (adopting the *Voigt* test to evaluate a claim of interference with an attorney-client relationship by the Government); *United States v. Kennedy*, 225 F.3d 1187, 1195 (10th Cir. 2000) ("We consider the Third Circuit's test as set forth in *Voigt* to be a reasonable method of evaluating Fifth Amendment claims based on allegations of an invasion of the attorney-client relationship.").  In evaluating whether the Government's use of

Haddock as an informant constitutes outrageous government conduct, the Court will use the *Voigt* test.

Before applying the *Voigt* test, it is worthwhile to discuss the facts of *Voigt* in depth, as that case is analogous to Williams' and Hernandez' situation. The defendant ("Voigt") in *Voigt* was convicted of masterminding an "advanced fee" scheme for a trust he operated by which he would obtain substantial fees in advance from unsuspecting loan applicants and investors for loans and investments that never materialized. *Voigt*, 89 F.3d at 1059. On appeal to the Third Circuit, Voigt raised the issue of whether the Government's use of a co-defendant attorney ("Travis") as a confidential informant constituted a violation of defendant's Fifth Amendment rights because of outrageous government conduct. *Id.*

The investigation in *Voigt* began in June of 1991 when Travis, who was working as an attorney for defendant's trust, approached an FBI agent regarding her concerns about the legitimacy of the trust and fear she was being defrauded. *Id.* at 1061. Aware of Travis' status as an attorney and her employment with the trust, an FBI agent who initially interviewed Travis asked her if she was working in a legal capacity for the trust. *Id.* Travis told the FBI agent that she was not working in a legal capacity for the trust, that her primary responsibility was to maintain contact with banks, and that a letter purporting to

appoint her as an attorney for the trust was false. *Id.* Based on these representations to the FBI agent, the FBI agent decided to enlist Travis' assistance in order to obtain incriminating information from Voigt. *Id.* The FBI agent arranged for Travis to wear a recording device in October of 1991 to record conversations Travis had with Voigt regarding criminal activity. *Id.* at 1062. After recording Voigt, Travis turned over several recordings to the FBI agent and again indicated that she had not performed any legal work for the trust. *Id.*

Approximately five months later in February of 1992, Travis advised the FBI agent that she had prepared a tax opinion for Voigt, which she characterized as a "one-shot deal." *Id.* Soon thereafter, Travis informed the FBI agent that she had convinced Voigt to allow her to become the trust's attorney, but that her function would be to facilitate communications between other entities and the trust. *Id.* Concerned with these developments, the FBI agent warned Travis about acting in a legal capacity. *Id.* At this time, a Government attorney overseeing the case informed Travis that the only information that Travis could provide was information subject to the crime-fraud exception to the attorney-client privilege. *Id.*

On May 1, 1992, Travis, who continued to supply incriminating information to the FBI agent, informed the Government that she was representing Voigt in connection with two

grand jury subpoenas for records that Voigt received. *Id.* at
1063. At this point, the Government ceased using Travis as a
confidential informant and had no further contact with Travis
until September of 1992 when Travis again informed the Government
that she was representing the trust in connection with the
subpoenas. *Id.* In response to this information, and before
further discussion could occur, another Government attorney
admonished Travis that she had a conflict of interest and should
withdraw from the case. *Id.*

After Voigt and Travis were indicted, Voigt moved to
dismiss the indictment, arguing the Government's investigation
against him constituted outrageous government conduct. *Id.* at
1063. The district court determined after Voigt's trial that the
Government had acted reasonably based on what Travis had told
them and that no outrageous conduct by the Government could be
found. *Id.* On appeal, the Third Circuit affirmed the district
court's determination that the Government's conduct was not
outrageous. *Id.* at 1068.

After forming the test for determining whether an
alleged intrusion into an attorney-client relationship
constitutes outrageous government conduct, see *supra*, the court
determined no outrageous conduct had occurred. Under the first
element, whether the government had an objective awareness of an
ongoing, personal attorney-client relationship between its

informant and the defendant, the court emphasized the complete lack of evidence demonstrating that the Government knew or should have known that Travis was acting as Voigt's attorney from the time the investigation started until May 1, 1992, when Travis disclosed that she was representing the trust. *Id.* at 1069. Even the fact that Travis had drafted the "one-shot" tax opinion for Voigt during this time period was not sufficient to establish that the Government should have known of an ongoing, personal attorney-client relationship between Travis and Voigt. *Id.* Regarding the second element, purposeful intrusion into the attorney-client relationship, the court also found this element not established because the Government, after the May 1st disclosure, was sensitive to the potential privilege problems and did not attempt to extract information from Travis thereafter. *Id.*

Finally, the court found no evidence in the record of substantial prejudice to Voigt, the third element. *Id.* at 1070. Most significant was Voigt's failure to demonstrate that any of the information Travis provided to the Government after May 1, 1992, was in fact privileged. *Id.* The court stated: "[T]his alone is fatal to Voigt's claim of outrageousness." *Id.* Voigt's failure to point "to at least one document Travis provided the government that was privileged" rendered his claim of outrageousness without merit. *Id.*

   i. The Government Had No Objective Awareness of
     an Ongoing, Personal Attorney-Client
     Relationship Between Haddock and Williams or
     Hernandez

   Williams and Hernandez have not demonstrated the

Government's investigatory conduct was outrageous under the *Voigt*

test.  Under the first element, Williams and Hernandez must

demonstrate that the Government was objectively aware of an

ongoing, personal attorney-client relationship between their

informant, Haddock, and Williams and Hernandez.  *Voigt*, 89 F.3d

at 1067.  The evidence produced at the motion hearing points to

an opposite conclusion that no attorney-client relationship

formed between Haddock and Williams or Hernandez and that the

Government should not have been objectively aware of an ongoing,

personal attorney-client relationship.

   First, little evidence was produced at the hearing

indicating that Haddock formed an attorney-client relationship

with Williams.  "An attorney-client relationship is created when

(1) a person seeks advice or assistance from an attorney, (2) the

advice or assistance sought pertains to matters within the

attorney's professional competence, and (3) the attorney

expressly or impliedly agrees to give or actually gives the

desired advice or assistance."  *State ex rel. Stivrins v.*

*Flowers*, 273 Neb. 336, 341-42, 729 N.W.2d 311, 317 (2007); *see*

*also Macawber Eng'g, Inc. v. Robson & Miller*, 47 F.3d 253, 256

(8th Cir. 1995) (applying state law to determine whether an

attorney-client relationship exists).  While Williams surely
sought "advice or assistance from an attorney" (i.e., Haddock),
the advice or assistance he sought was not for matters within an
attorney's professional competence.  The evidence reflects that
Williams initially sought out Haddock in order to exploit
Haddock's ability to smuggle an unmonitored cellular telephone
into DCCC for Williams to use.  Eventually, Williams attempted to
further exploit Haddock's position by enlisting Haddock in such
endeavors as the Mango Creek money laundering plan, the
transportation of drug money from Nebraska to Arizona, and the
smuggling of contraband into DCCC.  These illegal services are
not matters within an attorney's professional competence.
Further, an attorney-client relationship can only be formed after
both attorney and prospective client consent to its formation.
*United States v. Wiley*, No. 2:09-CR-200, 2011 WL 779895, at *2
(N.D. Ind. Feb. 28, 2011).  Haddock's repeated statements to
Williams that he would not act as Williams' attorney demonstrate
Haddock did not agree to form an attorney-client relationship
with Williams.

Second, assuming an attorney-client relationship
between Haddock and Williams existed (which the Court does not
believe to be the case), there was no evidence produced at the
motion hearing that law enforcement were objectively aware of an
ongoing, personal attorney-client relationship.  Similar to the

investigators in *Voigt*, every law enforcement officer investigating Williams and Hernandez testified that they did not believe Haddock was acting as an attorney for Williams at any time during the alleged drug-importation conspiracy. Based on the circumstances of the investigation, it was objectively reasonable for the investigators not to be aware of an alleged attorney-client relationship. Similar to *Voigt*, where Travis represented to the FBI agents at the investigation's onset that she was not representing Voigt, Haddock represented to the investigators in this case at the investigation's onset that he was not representing Williams. Also, law enforcement took steps to make sure that it was clear that Haddock was not Williams' attorney. S.A. Nellis specifically notified Haddock that he must communicate explicitly to Williams at the start of their first meeting on April 22nd that Haddock would not be acting as Williams' attorney and that Haddock was merely meeting with Williams in order to provide a phone for Williams to use. After Haddock gave this admonition to Williams at the beginning of their meeting, Williams confirmed he understood the situation that Haddock would merely be posing to others to be Williams' attorney in order to smuggle a phone to Williams. Williams stated: "I mean, that is what I'm saying, like if it ever came up, [Haddock], just cross your i's and dot your t's." Later during this meeting, while calling an associate, Williams stated:

"I got a new attorney man . . . No just a new friend." The next day, when Haddock returned to DCCC to meet with Williams, Williams states in reference to Haddock: "He's not [Conway]'s lawyer, [Haddock] does not represent us, he is just a friend, he is a lawyer who is a friend." Statements such as these by Williams are sufficient to support a finding that the Government was not objectively aware of an ongoing, personal attorney-client relationship between Haddock and Williams.

Third, Williams' repeated references throughout the investigation regarding Haddock being his attorney were not sufficient to make the Government objectively aware of an attorney-client relationship. The evidence from the motion hearing clearly shows that law enforcement officers believed Williams' statements were merely a code Williams used to alert the people he called that they were speaking on an unmonitored phone. Given the context of Williams' conversations on the phone, which typically involved conversations regarding illegal activity, it was objectively reasonable for law enforcement not to be aware of an attorney-client relationship even when Williams made statements to the contrary.[12] In addition, Haddock's

---

[12] Haddock's failure to correct Williams each time Williams referred to Haddock as his attorney is of no concern. Because the Government investigators reasonably concluded that Williams' references to Haddock being his attorney was a code, Haddock's failure to correct Williams in each instance did not create a situation in which the Government should have been aware of an ongoing personal attorney-client relationship between Haddock and Williams.

isolated statements that he was Williams' attorney are not sufficient to establish that law enforcement should have been aware of an attorney-client relationship.  Similar to *Voigt*, where the Government's knowledge of a "one-shot" tax opinion Travis prepared for Voigt was not sufficient to show the Government was objectively aware of an ongoing attorney-client relationship, Haddock's isolated references to Williams as his "client" are not sufficient.  Rather, Haddock's isolated statements were consistent with the code language Williams used to operate his illegal enterprise.

Fourth, Williams argues an attorney-client relationship was established of which the Government should have been aware, when Williams asked Haddock on several occasions for his thoughts on Williams' supervised release violation case.  This, however, is insufficient to establish an attorney-client relationship because "'a lawyer may answer a general question about the law, for instance in a purely social setting, without a client-lawyer relationship arising.'"  *State v. Parker*, 747 N.W.2d 196, 204 (Iowa 2008) (quoting Restatement (Third) of the Law Governing Lawyers § 14 (2002), cmt. c.).  At all relevant times during the investigation, Williams was represented by criminal defense attorneys Whitner and Lefler in connection with his supervised release violation case.  The questions Williams posed to Haddock were general legal questions akin to what a non-lawyer would ask

a lawyer at a party. These exchanges were not sufficient to form an attorney-client relationship between Haddock and Williams, and it was reasonable for the Government to not be aware, based on these exchanges, of a personal, ongoing attorney-client relationship between Haddock and Williams.

Fifth, Williams argues at great length in his post-hearing brief that Haddock's statement to Williams on June 1st demonstrates the existence of an attorney-client relationship of which the Government should have been aware. During the June 1st meeting, Haddock and Williams discussed at length their mutual understanding that the $5,000.00 Williams paid to Haddock in January 2009 was for research Haddock was to do for a third party, Dion. When Haddock uttered "I thought our friend was you," it had already been well established in the conversation that the money Williams paid to Haddock was not for legal work Haddock was providing to Williams. Even if Haddock was referring to Williams when he said "you," given the broader context of the conversation, it was reasonable for the Government not to conclude an attorney-client relationship existed. Further, Haddock testified at the hearing that he was not referring to Williams when he said "you." In the absence of contradictory evidence, the Court credits Haddock's testimony, and will not find Haddock's utterance sufficient to have put the Government on

notice of a supposed attorney-client relationship between Haddock and Williams.

Sixth and finally, Hernandez' assertion of an attorney-client relationship between her and Haddock is even less tenable than Williams' assertion of one. There is no evidence in the record establishing that she formed an attorney-client relationship with Haddock. The majority of interactions Hernandez had with Haddock were to coordinate the Mango Creek money laundering plan or to smuggle contraband into DCCC for Williams. Again, these are not "matters within an attorney's professional competence." *Stivrins*, 273 Neb. at 341, 729 N.W.2d at 317. As was the case with Williams, see *supra*, without this base showing of an attorney-client relationship, the Government could not have had an objective awareness of an ongoing, personal attorney-client relationship between Haddock and Hernandez. Both Williams and Hernandez have failed to establish the first element of the *Voigt* test, and the Court cannot conclude the Government was objectively aware of an ongoing, personal attorney-client relationship between Haddock and Williams or Hernandez.

              ii.   Williams and Hernandez Were Not Actually and Substantially Prejudiced

Hernandez' and Williams' claim of outrageous government conduct also fails under the third element of the *Voigt* test: actual and substantial prejudice. Assuming that the Government in Williams' case should have been aware of supposed attorney-

-40-

client relationships Haddock had with Williams and Hernandez and deliberately intruded into those relationships, Williams and Hernandez suffered no actual or substantial prejudice. The Third Circuit in *Voigt* found it most significant, and ultimately fatal to Voigt's claim of outrageous government conduct, that Voigt had failed to demonstrate any privileged information was disclosed to the Government. *Voigt*, 89 F.3d at 1070. In order for conversations with a lawyer to be privileged, they must be "confidential" and not "sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." Neb. Rev. Stat. § 27-503(2) and (4)(a); *see also State v. Spidell*, 194 Neb. 494, 497-98, 233 N.W.2d 900, 903 (1975) ("Communications between attorney and client made in the presence of others do not constitute 'privileged communications' within the meaning of the statute."); *Doyle v. Union Ins. Co.*, 202 Neb. 599, 615, 277 N.W.2d 36, 44 (1979) ("[A] communication between a lawyer and a client is not privileged if the services of the lawyer are sought or obtained to enable or aid anyone to commit or plan to commit what the client knew, or reasonably should have known, to be a fraud."). In this case, the Williams' and Hernandez' incriminating conversations were not privileged because they were either made in the presence of third parties or dealt with ongoing or future criminal activity. Indeed, Williams has never

maintained that his conversations with Haddock were subject to the attorney-client privilege.  *See*, *e.g.*, Williams' Post-Hearing Brief, Filing No. 667, at 5 ("Williams does not and never has contended under prevailing law evidence of marijuana sales gleaned from calls he made in Haddock's presence at [DCCC] are somehow privileged because of his professional relationship with Haddock.").  As a lack of privileged information being disclosed to the Government in *Voigt* was fatal to Voigt's claim of outrageous government conduct, the same is true for Williams and Hernandez.  Because none of the incriminating information Williams and Hernandez related to Haddock was privileged, Williams and Hernandez cannot show that they were actually and substantially prejudiced by the Government's actions.  Because Williams and Hernandez have failed to establish outrageous government conduct under the *Voigt* test, the Court finds no Fifth Amendment due process violation occurred.

      c. Other Cases

      Supporting the Court's conclusion that no due process violation occurred for outrageous government conduct is the case of *United States v. Ofshe*, 817 F.2d 1508 (11th Cir. 1987).  In *Ofshe*, the Government utilized an attorney to gather information on the attorney's client in a matter (a drug prosecution) that was unrelated to the attorney's representation of the client.  *Ofshe*, 817 F.2d at 1511.  Another attorney, who was co-counsel,

represented the client in connection with the drug prosecution at all relevant times. *Id.* To investigate the client, the Government placed a recording device on the attorney so that he could record his client and gave strict instructions to the attorney not to elicit any privileged information regarding the drug prosecution. *Id.* On appeal, the Eleventh Circuit determined the government's misconduct was not outrageous enough to warrant dismissal. *Id.* at 1516. In support of this finding, the Eleventh Circuit noted the client was not prejudiced by his attorney's cooperation because at all times the attorney's co-counsel provided zealous representation for the client in connection with the drug prosecution. *Id.*[13] Haddock obtained information on Williams' ongoing criminal activity and did not represent Williams in connection with his various pending criminal matters. At all relevant times, Williams was represented by other attorneys (i.e., Whitner and Lefler) in connection with his pending criminal matters. The fact these other attorneys represented Williams buttresses the conclusion that the Government's conduct was not outrageous in this case.

Williams and Hernandez cite at length two cases, *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991), and *United States v. Sabri*, 973 F. Supp. 134 (W.D.N.Y. 1996), in

---

[13] The Eleventh Circuit also determined, under the facts of the case, the Government did not violate the client's rights under the Sixth Amendment. *Id.* at 1515.

support of their argument that the Government's conduct in this case was outrageous.  The Court has reviewed these cases and finds they are distinguishable from the present case and do not support a finding of outrageous government conduct.

       d.   Defendants' Other Arguments

Williams and Hernandez raise other arguments in their briefs in support of their assertion that the Government's conduct was outrageous.  Chief among these is the laundry list of professional conduct violations Williams and Hernandez accuse Haddock of perpetrating.  As Williams frames the argument, the Government should not be allowed to "induce, aid and abet a lawyer to violate the Rules of Professional Conduct and use the ill-gotten gains to prove a marijuana case."

This argument can be put to rest easily.  An attorney's failure to assert an ethical obligation does not transform the Government's investigatory practices into misconduct.  *Stringer*, 535 F.3d at 942.  The focus of an outrageous government conduct claim is on the government's actions.  *Hunt*, 171 F.3d at 1195. Whether or not and to what extent Haddock's conduct implicates the Rules of Professional Conduct governing attorneys has little bearing on whether Government's conduct was outrageous.[14]  It is not contradictory to say that Haddock's actions in this case may

---

[14] The Court has made no determination in this case, one way or the other, as to whether Haddock's conduct violates a professional conduct rule.

be worthy of professional sanction, but that the evidence he obtained was not collected in violation of the Constitution.  It is the Court's understanding that Williams has filed a complaint for attorney misconduct against Haddock with the Counsel of Discipline for the Supreme Court of Nebraska.  The merits of that complaint will be reviewed in due course.  The result of that matter, however, should have no effect on determining whether the Government acted outrageously.

Williams also makes a policy argument that the attorney-client relationship will be unnecessarily damaged if the indictment against him is not dismissed.  The Court does not share Williams' pessimism.  It is already well established that communications between a client and an attorney are not privileged if the communication is regarding ongoing or future criminal activity.  Neb. Rev. Stat. § 27-503(4)(a); *Doyle*, 202 Neb. at 615, 277 N.W.2d at 44.  All of the recordings Haddock made contained discussions by Williams and associates regarding ongoing or future criminal activity.  The ability of the Government to use these recordings to secure a conviction of Williams will not have a chilling effect on the attorney-client relationship, since the recordings contain non-privileged information.  The Court's decision today merely reaffirms the principle that an attorney's presence cannot be used as a shield to prevent the disclosure of discussions of ongoing or future

criminal activity.  That was the rule before this case, and the
rule remains intact hereafter.

In sum, Williams and Hernandez have failed to
demonstrate the Government's investigation was "so outrageous and
shocking that it exceeds the bounds of fundamental fairness."
*Hunt*, 171 F.3d at 1195 (internal quotation marks omitted).  The
Government's conduct cannot be characterized as outrageous and
did not violate Williams' and Hernandez' rights under the Fifth
Amendment Due Process Clause.

2.   Haddock's Participation in the Conspiracy

Hernandez also argues the Government acted outrageously
when Haddock "created and participated in the creation of
documents, videos and tapes that were part of the money
laundering scheme that he in fact devised and put in play"
(Hernandez Pre-Hearing Brief, Filing No. 212, at 3).  Hernandez
argues, citing *United States v. Marshank*, 777 F. Supp. 1507 (N.D.
Cal. 1991), these acts by Haddock violated Hernandez' rights
under the Fourth Amendment (*Id.*).  As stated above, a claim for
outrageous government conduct is based in the Fifth Amendment.
*Searcy*, 233 F.3d at 1101 n.3.  The court in *Marshank* did not
discuss the Fourth Amendment, so it is not clear on what
authority Hernandez bases her Fourth Amendment claim of
outrageous government conduct.

Regardless of the proper basis, however, the Court finds the Government did not act outrageously in allowing Haddock to participate in the alleged drug importation conspiracy and Mango Creek money laundering plan. "[W]here a person is predisposed to commit an offense, investigative officers and agents may go a long way in concert with the defendant without being deemed to have acted so outrageously as to violate due process." *Nieman*, 520 F.3d at 838 (internal quotation marks omitted). In the context of infiltrating a drug conspiracy, investigators may participate in illegal enterprises and contribute things of value to the conspiracy in order to continue the investigation. *Hunt*, 171 F.3d at 1195. The Court finds the Government did not act outrageously in allowing Haddock to participate in the conspiracy in order to allow the investigation to continue. Dismissal of the Superseding Indictment is not warranted for this conduct.

3.   Right to Counsel - Sixth Amendment

Williams echoes his argument from the Conway Motion that the Government violated his right to counsel under the Sixth Amendment. For the same reasons Williams' Sixth Amendment argument failed in the Conway motion, see *supra*, so too it fails in the Haddock Motions. *See also Voigt*, 89 F.3d at 1071 n.10. ("We also reject Voigt's claim that the government's *pre* indictment use of Travis as a confidential informant, even

assuming she was his attorney, implicates Sixth Amendment concerns.").

4. Supervisory Authority

Finally, Williams invites the Court to exercise its supervisory authority to dismiss the indictment because of the Government's investigation. Federal courts possess supervisory powers, which allow them to formulate procedural rules not required specifically by the Constitution or by Congress. *United States v. Hastings*, 461 U.S. 499, 505 (1983). The purpose of these supervisory powers is "to implement a remedy for violation of recognized rights, . . . to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, . . . and finally, as a remedy designed to deter illegal conduct." *Hasting*, 461 U.S. at 505. Because the Court finds no outrageous conduct by the Government nor any other violation of Williams' rights, there is no basis for invoking the Court's supervisory powers. *Voigt*, 89 F.3d at 1071 n.10 (citing *Hastings*, 461 U.S. at 505-06).

## IV. CONCLUSION

Neither the suppression of evidence nor the dismissal of the indictment is warranted in this case. The Government lawfully obtained evidence when it enlisted Conway to record a conversation with Williams when the two shared a jail cell at DCCC. The Government's conduct in utilizing Haddock was not

-48-

outrageous, and it would be inappropriate to suppress the evidence Haddock obtained or dismiss the Superseding Indictment against Williams and Hernandez.  Accordingly,

IT IS ORDERED:

1)  Hernandez' Motion to Suppress Evidence (Filing No. 210) is denied;

2)  Hernandez' Motion to Dismiss Indictment (Filing No. 211) is denied;

3)  Williams' Motion Dismiss Indictment or to Suppress Evidence and Statements (Filing No. 213) is denied; and

4)  Williams' Motion to Suppress Statements of Conway (Filing No. 215) is denied.

DATED this 21st day of March, 2011.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court